750 So.2d 916 (1999)
STATE of Louisiana
v.
Damon THIBODEAUX.
No. 98-KA-1673.
Supreme Court of Louisiana.
September 8, 1999.
Rehearing Denied November 19, 1999.
*919 Denise LeBoeuf, New Orleans, for Applicant.
Richard P. Ieyoub, Attorney General, Paul D. Connick, Jr., District Attorney, Terry Michael Boudreaux, Cornelius Edward Regan, New Orleans, for Respondent.
James Oury, Clark Oury, for Damon Thibodeaux, amicus curiae.
TRAYLOR, Justice.[*]
On July 25, 1996, a Jefferson Parish grand jury indicted defendant, Damon Thibodeaux, for the first degree murder of Crystal Champagne, in violation of La.Rev. Stat. 14:30. After a trial by jury, the Defendant was found guilty as charged. At the conclusion of the penalty phase the jury, having found one aggravating factor, unanimously sentenced the Defendant to death. The trial judge sentenced Defendant to death in accordance with the jury determination. This matter is on direct appeal to this court. La. Const. art. V, § 5(D). On appeal, Defendant alleges fifty-five assignments of error for the reversal of his conviction and sentence.[1] Because we find no merit to Defendant's assignments of error, we affirm his sentence and conviction.

PROCEDURAL HISTORY
On July 25, 1996, a Jefferson Parish grand jury indicted defendant, Damon Thibodeaux, for the first degree murder of Crystal Champagne, in violation of La.Rev. Stat. 14:30. Defendant appeared for arraignment with counsel and entered a plea of not guilty. After motions and discovery, defendant's trial commenced on September *920 29, 1997. The jury returned the verdict of guilty of first degree murder on October 3, 1997. At the conclusion of the penalty phase, the jury unanimously returned the sentence of death after finding one aggravating circumstance: that the offender was engaged in the perpetration of an aggravated rape. Defense counsel filed motions for a new trial and for post-verdict judgment of acquittal, which the trial court denied. Defendant now appeals his conviction and death sentence on the basis of fifty-five assignments of error.

FACTS
On Friday, July 19, 1996, the victim, fourteen-year-old Crystal Champagne, left her home at the Tanglewood apartments in Westwego at about 5:15 p.m. to walk a short distance to a nearby supermarket. When she failed to return, her mother, Dawn Champagne, visited the supermarket looking for her and asking if any of the store personnel had seen anyone fitting Crystal's description. Crystal's father, C.J. Champagne, and Defendant were at the apartment when Crystal left. The two men began searching for her around 6:30 or 6:45 p.m. Several friends and neighbors also joined in the search. Dawn reported her daughter missing to Westwego police at approximately 7:30 p.m., and she did not recall that Defendant was still at the apartment at that time. C.J. indicated that Defendant left the apartment when he (C.J.) got on his bike to ride around Tanglewood looking for his daughter.
Jefferson Parish Sheriff's Office (JPSO) became involved in the missing person case and learned that the previous night, Thursday, July 18, 1996, Crystal's parents, Dawn and C.J. Champagne, had gone out drinking with Defendant and Stacy Melancon, a friend of Dawn's, while Crystal spent the night at Stacy's house and baby-sat her children. Stacy brought Crystal home on Friday around 2:00 p.m. and paid her $20 for babysitting.
Defendant was related to the Champagnes through his mother's previous marriage to Dawn's brother. Crystal was Defendant's step-cousin. Although Dawn knew Defendant as a little boy, he had lived in Texas for several years and had returned for his sister's wedding. Defendant had recently secured a job with Callie Towing Company, working as an offshore deckhand. He had been hanging around the Champagne home since he got back in from offshore on Thursday, July 18, 1996. That night, Defendant spent the night with the Champagnes, because he had drunk too much to drive home. The following afternoon, Defendant took C.J. to get his check cashed, and then purchased some rollerblades so that he could go rollerblading with Crystal and her 12-year-old sister, Samantha. However, Crystal quit skating early because of the heat. Later at the apartment, Defendant, Samantha, and Crystal drank cold drinks before Crystal left to go to the supermarket.
The search party for Crystal continued through the night and into the following day, Saturday, July 20, 1996. That afternoon around 5:30 or 6:00 p.m., Stacy Melancon went to pick her boyfriend up from work and the two of them stopped at several restaurants and convenience stores on the way home to drop off fliers about the missing Crystal. While they were at the Circle-K in Bridge City, they encountered two women who indicated that they had seen a girl fitting Crystal's description the night before, walking on the levee. Stacy and John went to the area of the levee where the women indicated. John walked on a path through some trees to a grassy area of the batture under the Huey P. Long Bridge and yelled for Stacy. They found Crystal's corpse on a concrete slab. She was naked, with her shirt and bra pulled up to her shoulders, revealing a red wire ligature wrapped around her neck. Her shorts and panties were pulled down around her ankles. Stacy recalled that she had washed the clothes Crystal had on the previous morning before she took her home. Maggots and ants had invaded her body. Stacy went and called the police, who arrived on the scene at 7:47 p.m.
*921 Dr. Fraser MacKenzie of the Jefferson Parish coroner's office performed the autopsy on Crystal. He attributed the cause of death to asphyxiation by ligature application. He described indentation injuries to the neck corresponding to the placement of the ligature. In addition, he related secondary injuries including trauma and hemorrhaging to the right eye and right forehead and a skull fracture in the same area. He surmised that this injury was not caused by a fist but something harder like a rock or a bat. The victim was missing an upper right tooth and a lower tooth was chipped. She had blood in the socket, indicating that the tooth had been knocked out in her final struggle. The authorities located the missing tooth beside Crystal's body at the murder scene. She also had an injury to her lip and her tongue was protruding because of the pressure applied to her neck during the strangulation. He also noted contusions to her buttocks which indicated a struggle. During autopsy, the doctor located sixteen dollars in one of Crystal's socks. Finally, Dr. MacKenzie estimated that the victim had been dead approximately twenty-four hours when her body was discovered and that it probably took between five and ten minutes to die.
Dr. Lamar Leek, professor of entomology at Louisiana State University, testified as an expert in the field of forensic entomology. He examined the insect samples taken from Crystal's body. He testified that flies will lay eggs on a carcass within a couple of hours, but will not lay eggs after dark. Therefore, he determined that the eggs were laid before nightfall on July 19, 1996, and calculated the age of the fly larvae (maggots) to be between 24-28 hours old at discovery.
On July 20, 1996, before Crystal's body was found, the authorities continued searching for the missing girl and questioned anyone who had been with her before she disappeared. Lt. Kevin Theriot, commander of the JPSO juvenile crimes unit, interviewed Defendant at the police station at 7:56 p.m. in conjunction with the missing person case. During the officer's advisement of rights, another officer notified him that Crystal's body had been discovered. Accordingly, Lt. Theriot terminated the interview, without obtaining Defendant's signature on the rights form, and the case became a homicide investigation. Sgt. Dennis Thornton, a JPSO homicide detective, became the case officer and prepared a new rights form, which Defendant signed, indicating that he waived his rights. Sgt. Thornton began interviewing Defendant at 8:10 p.m. Defendant was cooperative and gave a statement around 10:20 p.m. in which he denied any knowledge of Crystal's disappearance or death. Defendant eventually gave a full confession admitting that he had picked Crystal up at the supermarket and they rode around in his car for a little while, ending up on the levee under the bridge. Defendant claimed "she wanted me to have sex with her," so they started kissing. He stated that when they started to have sex, Crystal "started hollering `Ouch, it hurts! Take it easy.'" Defendant admitted that, at this point, he actually started getting rougher and just "snapped," hitting her two or three times. He continued having sex with Crystal, who started fighting and kicking him, so he put his hands around her throat. He claimed that as he squeezed her throat, he ejaculated, both inside and outside Crystal. He continued to squeeze her throat for about ten to fifteen minutes and admitted that he looked at her face and she looked scared. He then retrieved a speaker wire from the trunk of his car and "put it around her throat and tied it." Defendant admitted that after killing Crystal, he went back to the apartment and started to help the family search for her.
Two women walking on the levee for exercise observed Defendant after the murder, pacing and acting nervous. They subsequently identified him from a photographic lineup and at trial.
Following Defendant's arrest, the police executed search warrants for Defendant's *922 home and car. The officers seized several items of Defendant's clothing and bath towels. Also seized was a pack of Marlboro cigarettes. Hairs and fibers were vacuumed from Defendant's car and compared with samples taken from the victim. No matches were found by the crime lab which conducted the forensic and trace analysis. In addition, a male rape examination was conducted on Defendant, but no semen was recovered from any of the victim's clothing or from any swabs (oral, vaginal, and rectal) taken at autopsy. Sgt. Thornton surmised that he would not expect to be able to detect semen on the ground one day later or on a body infested with maggots. He further theorized that during the twenty-four hour period leading to Defendant's arrest, he had ample opportunity to discard evidence of his crime.
Defendant elected not to testify in his own defense. His mother, Cynthia Thibodeaux, and his sister, Vicky Chauvin, testified loosely to an alibi defense. Through psychological and sociological experts, Dr. Edward Shwery, Beth Denton, and Dr. Mark Cunningham, the defense presented Defendant's formative years, fraught with abuse and neglect, and suggested that as a result, Defendant was easily manipulated by police and coerced into confessing to a crime for which he was innocent.

DISCUSSION

Assignments of Error 42-45
In these arguments, Defendant avers that his confession was false, unreliable, and involuntary, and should not have been admitted. Counsel also argues that by failing to record the entire interrogation, the State deprived Defendant of his constitutional right to present evidence of his innocence. Defendant's argument is twofold. He insists that his confession was psychologically coerced[1] and that the police failure to record the "entire" interrogation violated his right to present a defense. He also claims that he had the right to present the circumstances of his interrogation before the trier of fact, however, the State denied him this right by failing to record the interrogation. He claims this omission deprived him the right to present a defense and to cross-examine the witnesses against him as guaranteed by the Fourteenth Amendment Due Process Clause, as well as the Sixth Amendment Compulsory Process and Confrontation Clauses. In Defendant's view, the "entirety" of his confession "is the whole night he spent being interrogated." Defendant further complains that his statements constitute unreliable evidence, and as such, cannot support his conviction and death sentence.
As a general matter, before a confession may be admitted into evidence, the State has the burden of affirmatively showing that it was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises. La.Rev.Stat. 15:451; State v. West, 408 So.2d 1302, 1307 (La.1982); State v. Dewey, 408 So.2d 1255, 1258 (La.1982). Furthermore, if the statement was made during custodial interrogation, the state must show that the defendant was advised of his constitutional rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Petterway, 403 So.2d 1157, 1159 (La. 1981); State v. Sonnier, 379 So.2d 1336, 1355 (La.1979). The admissibility of a confession is a question for the trial judge, whose conclusions on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility should not be overturned on appeal unless they are not supported by the evidence. State v. Jackson, 381 So.2d 485, 487 (La.1980).
At the hearing on Defendant's motion to suppress statements, Sgt. Thornton testified that Defendant arrived at the detective bureau at about 7:45 p.m. on July 20, 1996 to be interviewed in connection with the missing persons investigation. The *923 detective began preparing a rights form for Defendant as part of that investigation. However, before Defendant could sign the rights form, the interview was interrupted when the detective was notified that Crystal's body had been found. Consequently, the original rights form remained unsigned. The case then shifted from a missing person report to a homicide. A second rights form was prepared to reflect that change and Defendant executed this form at 8:10 p.m. He was advised of his rights, pursuant to Miranda at 8:10 p.m. and gave his first statement at about 10:20 p.m. In this statement, Defendant repeatedly denied any involvement in Crystal's death.
After the first statement, Defendant voluntarily submitted to a polygraph examination. Lt. Stacy Phillips testified at the motion hearing that he prepared a voluntary consent form which Defendant executed at approximately 12:20 a.m. After Defendant's responses showed deception regarding the death of the victim, Defendant tried to account for the adverse reading by explaining that he had a "dream" in which a black man strangled a young white girl on the levee after raping her. The "dream" became the subject of Defendant's second statement which was taken at 2:45 a.m. The third and final statement was taken at 4:21 a.m. Sgt. Thornton testified that Defendant was re-advised of his Miranda rights before giving his statement at 2:45 a.m. and again before giving his statement at 4:21 a.m.; however, no additional rights forms were executed for the subsequent statements and no recordation of the re-advisement appears on the tapes and transcripts of those statements. The State played all three recorded statements at trial and there is no indication in the record that taping the "entire" evening would have yielded any additional evidence favorable to Defendant. Notably, Defendant did not testify at the motion to suppress to allege any coercion by the officers. Additionally, nowhere does Defendant suggest that he was threatened, beaten, or in any way mistreated during the entire interrogation period.
Defendant fully confessed at 4:21 a.m. on July 21. Sgt. Thornton explained that during the interim, between advising Defendant of his rights and taking the statements, additional interviews between the detective and Defendant took place. In addition, the detective removed himself from the interview room from time to time to attend to other aspects of the investigation. Defendant argues that the detectives supplied him the details of the crime, and then, by the power of suggestion, he "parroted" those points in his coerced confession. He further claims that his confession was the product of hypnotism, conducted on him by Major Walter Gorman. Finally, Defendant's psychological and sociological experts, Dr. Shwery and Beth Denton, testified that Defendant is a passive and dependent person who is very easily led. They also described Defendant as suggestible, acquiescent, and willing to cooperate. Contrary to the defense contention, there is no indication in the record that Defendant's will was overborne by the detectives causing him to confess to crimes he did not commit.
Defendant contends that his due process rights were violated because Sgt. Thornton talked to him while the tape recorder was turned off. However, there is no due process requirement that a statement given to the police must be recorded. Nor is there any support in the record for the Defendant's claim that a portion of his statement was unrecorded somehow violated his due process rights or coerced him into giving a confession. The law does not require the production of non-existent portions of the confession or portions which cannot be recalled. State v. Marmillion, 339 So.2d 788, 793 (La.1976). In the absence of proof to the contrary, the fact that the purported statement of the accused as testified to by the investigating officer does not consist of a verbatim reiteration of the conversation between them due to the witness's inability to recall or other *924 valid explanation does not violate the rights of the accused. State v. Lefevre, 419 So.2d 862, 867 (La. 1982). The instant record does not support Defendant's contention that the statements were involuntary or unreliable. Consequently, the trial judge did not err in admitting Defendant's statements and this argument is without merit.

Assignments of Error 33, 44, and 52
In this argument, Defendant claims that the trial court erred in denying him the right to question potential jurors about the defense theory of the case. Specifically, Defendant urges that the trial court improperly and unfairly curtailed his right to a free and full voir dire by not permitting the defense to inquire about the potential jurors' ability to accept a "false confession" theory of the defense.
As a general matter, the scope of voir dire examination lies within the sound discretion of the trial court and its rulings will not be disturbed on appeal in the absence of a clear abuse of that discretion. Although a court has discretion to restrict voir dire, it must nevertheless afford the attorneys wide latitude in examining prospective jurors as a means of giving effect to an accused's right to a full voir dire. La. Const. art. I, § 17; La.Code Crim. Proc. art. 786; State v. Maxie, 93-2158 (La.4/10/95); 653 So.2d 526, 534-35; State v. Hall, 616 So.2d 664, 668-69 (La.1993); State v. Lee, 559 So.2d 1310, 1316 (La. 1990). Thus, while a trial court has control over the scope of jury selection and may limit voir dire examination accordingly, the limitations may not be so restrictive as to deprive counsel of a reasonable opportunity to determine grounds for challenges for cause and for the intelligent exercise of peremptory challenges. State v. Hall, 616 So.2d. at 668-69; State v. Duplessis, 457 So.2d 604, 606 (La.1984) conviction reversed on other grounds; State v. Williams, 457 So.2d 610, 613 (La. 1984).
In the instant case, during the general voir dire, i.e., after the Witherspoon questions had been completed, counsel asked the first panel of prospective jurors, "Do you believe in something called the power of suggestion?" The State objected, on grounds of relevance, to the defense asking case specific questions during voir dire in an attempt to commit prospective jurors to an outcome before trial. Specifically, "power of suggestion" is not an element of the crime; nor is it a defense. Despite the argument at the bench on counsel's question, all of the panel had already responded affirmatively. However, once one of the panelists asked for an example of what counsel was asking, the attorneys again approached the bench. To explain to the judge and the prosecutor where he was going with the line of questioning, counsel stated that he was going to ask about subliminal messages on TV, POW brain washing, and placebos which show how someone's mind could be affected by another. In counsel's view, the police suggested certain elements of the offense to Defendant and counsel sought to test the panels' ability to accept the notion that a confession could be unreliable because it had been psychologically coerced.
Louisiana law clearly establishes that a party interviewing a prospective juror may not ask a question or pose a hypothetical which would demand a commitment or pre-judgment from the juror or which would pry into the juror's opinions about issues to be resolved in the case. State v. Williams, 230 La. 1059, 89 So.2d 898, 905 (1956); State v. Vaughn, 431 So.2d 358, 360 (La. 1982); State v. Square, 257 La. 743, 244 So.2d 200, 226 (1971) vacated in part, 408 U.S. 938, 92 S.Ct. 2871, 33 L.Ed.2d 760 (1972), mandate conformed to, 263 La. 291, 268 So.2d 229 (1972); State v. Smith, 216 La. 1041, 45 So.2d 617 (1950). It is not proper for counsel to interrogate prospective jurors concerning their reaction to evidence which might be received at trial. Id. Further, the question asked directly referred to key facts in the case and called for a prejudgment or commitment by the prospective *925 jurors regarding those facts. See State v. Bell, 477 So.2d 759, 765-67 (La. App. 1st Cir.1985), writ denied, 481 So.2d 629 (La.1986).
Defendant's position is analogous to that presented in Duplessis. There, the trial court curtailed counsel's voir dire examination probing whether the prospective jurors had ever experienced a case of mistaken identity, the sole defense in the case. State v. Duplessis, 457 So.2d at 606-07, n. 4. Although this court declined to reverse solely on the issue of voir dire curtailment, its review of the entire record of voir dire presented "a very close question." Id. at 606. Likewise, the instant Defendant's sole defense was that his confession was coerced. However, counsel's examples that he wanted to pose in voir dire, i.e., POW brain washing, subliminal messages on television, and placebos, were apparently too far afield and extreme for the trial judge. The trial court sustained the state's objection, finding that:
[T]his is prejudging and pre-picking jurors or setting up jurors to get only the ones who believe a certain way to be on the jury, and I don't think its grounds, I don't necessarily think its grounds to throw a juror off, because they don't believe in it ... And you're putting in something that is nowhere in any code....
Defendant asserts that Hall warrants a reversal of his conviction, however we find his reliance on that case is misplaced. In Hall, this court reversed the defendant's conviction and death sentence based on the "trial judge's limitation on the defense's ability to examine prospective jurors on their understanding of the law." Hall, 616 So.2d at 669 (emphasis added). Conversely, in the case at hand the notion of "power of suggestion" has no basis in law and the trial court's limitation on counsel's questions in this regard was not error. In any event, trial counsel acquiesced when the judge curtailed his questioning and did not modify his examples or present the "power of suggestion" line of questioning to any future panels. In these instances, this argument lacks merit.

Assignments of Error 38 and 53
In this argument, Defendant asserts that the trial court failed to instruct the jury on the only statutory aggravator found or argued in the penalty phase. Specifically, Defendant complains that at the close of the penalty phase, the trial judge failed to define the elements of "perpetration or attempted perpetration of aggravated rape." In Defendant's view, the jury, without such a definition, was left with unfettered discretion to impose its sentence.
As an initial matter, the defense lodged no objections during trial to what it now alleges was error. However, because the error occurred during the penalty phase of a capital case, such a failure does not prevent this court from reviewing errors raised for the first time on appeal. State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364, 375; but see State v. Wessinger, 98-1234 (La. 5/28/99), 736 So.2d 162 [Applies to trials prospectively extend Taylor to penalty phase errors]. The goal of the contemporaneous objection rule of La. Code Crim. Proc. art. 841(A) and La.Code Evid. art. 103, to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which he either could have avoided or corrected at the time or should have put an immediate halt to the proceedings, are just as valid in the penalty phase as in the guilt phase. State v. Cooks, 97-0999 (La.9/9/98); 720 So.2d 637; State v. Taylor, 669 So.2d at 368. In any event, Defendant's claim of error is somewhat toothless, given that the trial court had fully and exhaustively defined the elements of aggravated rape and attempt to the same jurors just the day before. In addition, before instructing the jury after the guilt phase, the judge sought approval of the jury charges from the attorneys and counsel indicated that he did not have any problem with the charges. Furthermore, the jury instructions read by the judge following the penalty phase mirror the *926 Louisiana Judges' Criminal Bench Book, § 7.03 (1993). We perceive no violation of the La.Code Crim. Proc. art. 905.3 requirement that the court shall instruct the jury concerning the aggravating circumstances. This argument lacks merit.

Assignments of Error 35, 46, 47, 48, 49, 50
In this argument, Defendant alleges that the evidence is insufficient to convict him of first degree murder because the evidence of aggravated rape is insufficient as a matter of law to support the verdict. In an unbriefed assignment of error, Defendant also contends that the trial court erred by denying the motion for post-verdict judgment of acquittal. Defendant's sufficiency argument is twofold.
First, in Defendant's view, the only evidence of rape presented by the State was Defendant's own confession. However, as previously discussed, Defendant now claims that his confession to the police was false. Therefore, without corroborating physical evidence to refute "any number of reasonable hypotheses" of why Crystal was found naked from her neck to her ankles, the State's circumstantial case of rape falls apart. In fact, Defendant suggests that the lack of physical evidence of rape proves false any portion of Defendant's confession relative to rape.
Second, Defendant contends that his conviction violates Louisiana's corpus delicti rule which bars conviction based solely on a Defendant's uncorroborated extrajudicial confession. In Defendant's rendition, the absence of any forensic or trace evidence, including hair, fibers, or semen, supports his position that the State failed to prove the predicate felony of aggravated rape necessary for his first degree murder conviction. He posits that given the circumstantial evidence, especially Crystal's shirt and bra pulled up around her shoulders and her shorts and panties pulled down almost to her ankles, the State failed to exclude every reasonable hypothesis of innocence, see La.Rev.Stat. 14:438, and that evidence is indicative of any number of crimes besides rape, which do not support a conviction of first degree murder, namely: sexual battery, aggravated sexual battery, oral sexual battery, carnal knowledge of a juvenile, or molestation of a juvenile.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Captville, 448 So.2d 676, 678 (La.1984). The appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. Id. Similarly, under La.Code Crim. Proc. art. 821(B), a post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.
The State charged Defendant by bill of indictment with first degree murder, which is defined in Rev. Stat. 14:30(A)(1) as follows:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of... aggravated rape....
Under the Louisiana corpus delicti rule, an accused cannot be convicted on his own uncorroborated confession without proof that a crime has been committed by someone. State v. Cruz, 455 So.2d 1351, 1355-56 (La.1984); State v. Carson, 336 So.2d 844, 847-48 (La.1976). In a homicide case, the corpus delicti consists of proof that the victim died and that the death was caused by a criminal act. 1 McCormick, Evidence § 145, p. 557 (Strong ed., 4th ed.1992); 7 Wigmore, Evidence § 2072 (Chadbourn rev.1978). This independent proof need not go to every element of the offense; and, it may be either direct or circumstantial in nature. McCormick, supra, at 558, *927 558-59. The prosecution must show "that the injury specified in the crime occurred and that the injury was caused by someone's criminal activity." State v. Martin, 93-0285 (La.10/17/94); 645 So.2d 190, 194, citing 1 McCormick, Evidence § 145 (Strong ed., 4th ed.1992). Martin removed any confusion over the scope of the rule by expressly holding that the state need not produce independent evidence corroborating every element of the crime admitted in the accused's statement as long as it establishes the commission of a criminal act.
This court in Martin found that Summit v. Blackburn, 795 F.2d 1237 (5th Cir. 1986), unjustifiably extended the Louisiana corpus delicti rule by requiring only corroboration of the reliability of an inculpatory statement:
The rule should not be extended to add a requirement that independent evidence corroborate every element of the crime admitted in the accused's statement, the general reliability of which has been corroborated. Corroborating evidence need only show the essential injury involved in the charged crime (e.g., death caused by criminal activity in a murder charge) in order to establish the reliability of the inculpatory statements of the accused; the corroborating evidence need not show every element in the definition of the charged crime (e.g., the predicate felony in a felony murder).

State v. Martin, 645 So.2d at 195 (emphasis added).
The trustworthiness approach to the corpus delicti rule thereby provides the necessary minimum assurance against convictions based on untrue confessions. Id. As in the instant case, the defendant in Martin, also charged with first degree murder, argued that his statements admitting his commission of the predicate felony aggravated rape were not corroborated by independent evidence. Id. In the instant case, there was independent evidence sufficient to prove corpus delicti. The State introduced the testimony of Dr. Fraser MacKenzie of the Jefferson Parish Coroner's Office, who performed the autopsy on Crystal. He described the red wire ligature found around the child's neck and testified that the cause of death was asphyxiation and the method of death was homicide. With this independent proof of the corpus delicti, jurors were entitled to consider all other evidence in the case on the issue of the predicate felony of aggravated rape, including all of the circumstantial evidence (e.g., the victim's state of undress) and Defendant's own taped statements. As this court held in Martin, proof of every element of the predicate offense is not necessary. In the instant case, there was a sufficient level of corroboration to evaluate the trustworthiness of the Defendant's account and to establish that the death was caused in a criminal manner. Thus, the State proved that Defendant committed a homicide while engaged in the perpetration or attempted perpetration of an aggravated rape. The evidence presented is sufficient to support Defendant's conviction of first degree murder. This assignment of error is without merit.

Assignment of Error 39
In this assignment, Defendant urges that it was error for the trial court to impermissibly burden his right to present evidence of the frequency of commutation by allowing the State to introduce prejudicial, inaccurate, and wholly irrelevant information about other cases, individuals, and the "Angola lifestyle." Anticipating that the trial judge would give the commutation instruction permitted since the 1995 amendment of La. Const. art. I, § 16 and the reenactment of La.Code Crim. Proc. art. 905.2(B) by 1995 La. Acts No. 551, the defense retained Dean Burke Foster, a sociologist and expert in executive clemency and corrections.[2] The purpose *928 of the defense retaining such an expert was to present the infrequency with which Louisiana governors have used their clemency power with respect to capital convicts and inmates serving life sentences for murder. However, Defendant now complains that the prosecutor used Foster's testimony, on cross-examination, as an opportunity to discuss specific cases of murderers whose sentences had been commuted and about prison life at Angola.
As an initial matter, counsel never once objected, on any grounds, during the prosecutor's cross-examination of Foster. However, because the claimed error occurred during the penalty phase of a capital case, such a failure does not prevent this court from reviewing errors raised for the first time on appeal. State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364, 375. In any event, this court must consider whether the prosecutor's use of the commutation instruction as a vehicle for introduction of "Angola lifestyle" evidence through cross-examination and later in argument injected arbitrary factors or prejudice into the Defendant's sentencing hearing.
Arbitrary factors are those which are entirely irrelevant or so marginally relevant to the jury's function in the determination of sentence that the jury should not be exposed to these factors; otherwise, the death penalty may be imposed "wantonly or freakishly" or for discriminatory reasons. State v. Comeaux, 93-2729 (La.7/1/97); 699 So.2d 16, 21-22, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998), citing Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Given the lack of objection at the penalty phase to this evidence, harmless-error analysis must mean something more than the Chapman test of harmless error for properly preserved errors, if counsel is to have any incentive for bringing problems to light at a time when the court may still correct them. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Under Chapman, the reviewing court must be able to declare that the error was harmless beyond a reasonable doubt, namely, that no reasonable possibility exists that the error contributed to the verdict. Id. In the context of Rule 28 review, the existence of an arbitrary factor requires this court to find an error of such magnitude that it undermines confidence in the jury's sentencing verdict, essentially the same kind of error that would support the prejudice prong under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for claims of ineffective assistance of counsel. State v. Howard, 98-0064 (La. 4/23/99); 751 So.2d 783.
The Defendant cannot make that showing here. Even assuming counsel had objected, viewing Foster's testimony as a whole, nothing asked of that witness on cross-examination was improper under La. Code Evid. art. 611. Under Article 611(B), a witness may be cross-examined on any matter relevant to any issue in the case, including credibility, and the scope of cross-examination need not be limited to matters covered in direct examination. State v. Richardson, 258 La. 62, 245 So.2d 357 (1971). Foster's testimony on direct was so broad that he opened the door to many of the questions the prosecutor raised on cross-examination. In addition, counsel was the first to question Foster about the Angola lifestyle by asking about working in the fields and the agricultural labor to which some inmates are assigned.
However, this court has definitively stated that comments detailing life at Angola are error. State v. Kyles, 513 So.2d 265, 274-75 (La.1987), cert. denied, 486 U.S. 1027, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988). In Kyles, this court upheld the defendant's conviction and sentence after a similar argument. The Kyles court found that even though the prosecutor strayed into prohibited subjects such as cable television at Angola, the state of affairs in that parish, and the need for the jury to send out a message by returning a death verdict, the closing argument in its entirety *929 did not render the jury's sentence recommendation unreliable. State v. Kyles, 513 So.2d at 275. In Kyles, unlike the instant case, the defense objected to these comments, and unlike Smith, the objection was sustained.
In the instant case, the defense first introduced detailed information about prison life through its "corrections" expert. To the extent the prosecutor questioned the witness about matters such as television, the publication of The Angolite, and recreational activities at prison, Defendant cannot now complain of the admission of this testimony when he put these matters directly at issue. Although the prosecutor certainly questioned the witness about prohibited topics, it was the defense who brought forth this expert witness on the corrections system, and then remained inexplicably silent as the prosecutor delved into topics that skirted arguably reversible error. The prosecutor returned to the subject of the Angola lifestyle during the state's rebuttal argument in the penalty phase:
He's going to be at Angola for the first ninety days he'll be on the farm detail. Then after that he can maybe go work as a hospital orderly. Maybe he can go work in the dormitories. Or how about being a D.J. in the radio station. They work forty hours a week. After that then can go on with their hobbies, wood working.
At this point, counsel objected and the judge ruled that the argument was not grounds for a mistrial, but cautioned the prosecutor to "move on." Notably, counsel had just previously reminded the jurors of Foster's testimony and the Angola lifestyle in his closing argument.
Under these circumstances, the cross-examination taken as a whole does not rise to the level of reversible error. State v. Sepulvado, 93-2692 (La.4/8/96); 672 So.2d 158, 166; State v. Glass, 455 So.2d 659, 667-68 (La.1984). This court has previously held a prosecutor's reference to Angola lifestyle in argument was harmless and did not constitute reversible error. State v. Scales, 93-2003 (La.5/22/95); 655 So.2d 1326, 1334. No error of such a magnitude that would undermine the confidence in the jury's death verdict is presented in this assignment. Accordingly, no relief appears due.

Assignment of Error 54
In this assignment, Defendant argues that the penalty phase instructions were constitutionally deficient because the jury was told that they "may" consider mitigation, and were not told that a finding of mitigation need not be unanimous. The specific instruction about which Defendant now complains follows:
Even if you find the existence of a aggravating circumstance, you may also consider any mitigating circumstances before you decide that a sentence of death should be imposed. (emphasis added)
At this point, the judge read the entire list of mitigating circumstances provided for by La.Code Crim. Proc. art. 905.5. In Defendant's view, the trial judge should have "informed the jury that they were required to consider any mitigating factors in its sentencing decision."
As an initial matter, the defense lodged no objections during trial to what it now alleges was error. However, because the error occurred during the penalty phase of a capital case, such a failure does not prevent this court from reviewing errors raised for the first time on appeal. State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364, 375; cf., State v. Cooks, 97-0999 (La.9/9/98); 720 So.2d 637. In any event, viewing the instruction as a whole, Defendant's claim appears baseless.
Defendant is correct insofar as the Louisiana Judges' Criminal Bench Book, § 7.03(D) (1993), which provides: "Even if you find the existence of an aggravating circumstance, you must also consider any mitigating circumstances...." (Emphasis added). The judge correctly read the next portion of the instruction:
However, in addition to those specifically provided mitigating circumstances, you must also consider any other relevant *930 mitigating circumstances. You are not limited only to those mitigating circumstances which are defined. You may consider any other relevant circumstances which you feel should mitigate the severity of the penalty to be imposed.
This portion of the instruction is identical to the language prescribed in the Louisiana Judges' Criminal Bench Book, § 7.03 (1993), and adequately conveyed to the jurors that they should consider any mitigating evidence. Accordingly, the judge cured any erroneous impression that considering mitigating circumstances was permissible as opposed to mandatory, and the fact that the judge misspoke does not warrant reversal. As the United States Supreme Court observed, the jury instruction was not a structural error, but rather an error subject to harmless error analysis. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 2081-83, 124 L.Ed.2d 182 (1993). Here, the judge's misstatement did not deprive the Defendant of a fundamentally fair sentencing hearing producing a reliable result, nor can it be said that Defendant's death verdict was "attributable to the erroneous instruction." Id. This assignment lacks merit.

Assignments of Errors 1, 48, 49, 50
In this argument, Defendant contends that the trial court erred in ruling that he was not entitled to the grand jury transcript, given the inadequate notice provided to him of the aggravating circumstance which allegedly made this a first degree murder and the likelihood of favorable evidence in the transcript.
The Louisiana Constitution of 1974 provides that an accused shall be informed of the nature and cause of the accusation against him. La. Const. Art. I, § 13. That requirement is implemented by La.Code Crim. Proc. art. 464, which provides:
The indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the Defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the Defendant to his prejudice.
Article 465, however, authorizes the use of specific short form indictments in charging certain offenses, including first degree murder. The constitutionality of the short forms has been consistently upheld by this court. State v. Baylis, 388 So.2d 713, 718-19 (La.1980); State v. Liner, 373 So.2d 121, 122 (La.1979). When those forms are used, it is intended that a defendant may procure details as to the statutory method by which he committed the offense through a bill of particulars. La.Code Crim. Proc. art. 465, cmt. (a); State v. Baylis, 388 So.2d at 719; State v. Johnson, 365 So.2d 1267, 1270-71 (La.1978).
In any event, the time for testing the sufficiency of an indictment or bill of information is before trial by way of a motion to quash or an application for a bill of particulars. State v. Gainey, 376 So.2d 1240, 1243 (La.1979). A post-verdict attack on the sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth any identifiable offense. La.Code Crim. Proc. art. 465, cmt. (a); State v. Williams, 480 So.2d 721, 722, n. 1 (La.1985).
In the instant case, the State charged Defendant by bill of indictment, which read, in pertinent part: "Damon Thibodeaux ... on or about the 19th of July ... 1996 with force and arms, in the Parish of Jefferson ... violated R.S. 14:30 in that he did commit first degree murder of Crystal Champagne." Accordingly, Defendant was charged in compliance with La.Code Crim. Proc. art. 465(A)(31).[3]
*931 Moreover, contrary to Defendant's assertion, the defense was notified well in advance of trial that the State would seek to prove first degree murder under La. Rev.Stat. 14:30(1); that Defendant killed Crystal Champagne during the "perpetration or attempted perpetration of an aggravated rape." The State answered Defendant's bill of particulars somewhat inartfully stating that the underlying felony to Rev. Stat. 14:30(1) which the State will seek to prove is "attempted perpetrator of aggravated rape." However, Defendant cannot claim lack of notice, as the State provided open file discovery to the defense and provided copies of transcripts of Defendant's statements, as well as the cassette tapes of those statements, in which he confessed to raping Crystal. The State also turned over a copy of the supplemental police report to the defense on May 2, 1997.
In Defendant's view, the grand jury transcript could have cured the notice problem. Under this guise, defense filed a motion for the production of grand jury transcripts seeking specifically the testimony of any witness that testified to the grand jury that the underlying felony in this first degree murder was aggravated rape. At a motion hearing held on February 7, 1997, counsel made the following plea to the court:
Judge, I would ask that the state clarify its position, obviously, in the Bill of Particulars on First Degree Murder, particularly Response Number 3 where the state said, "Attempted perpetrator of aggravated rape." That language is a little nebulous to me, but because of the fact that I've had prior discussions with Ms. Morgan from the D.A.'s Office, and she essentially said that an Aggravated Rape did not occur, it was an Attempted Rape, I will bring to the court's attention that Mr. Thibodeaux was in fact indicted for First Degree Murder with the underlying felony being Aggravated Rape.
There was an arrest report from the officers to that effect. There is a magistrate's sheet and whatever else shows Aggravated Rape. Now the state is saying, no, an Aggravated Rape did not occur. The problem is it still went to the grand jury, and somebody testified to the grand jury that this was an Aggravated Rape.
Apparently in light of the State's answer, noted above, Defendant seems to suggest that if the underlying felony is only attempted aggravated rape then any lack of physical evidence to corroborate the rape would be considered favorable to him. On May 2, 1997, the trial court conducted an in camera inspection of the grand jury transcripts and ruled that they contained no Brady material. Accordingly, the judge denied the defense motion.
Defendant urges that the harm was his "uncertainty as to the preparation of his defense." He further claims that the prejudice was compounded by the trial court's failure to attach a sealed copy of the grand jury transcripts to the record for this court's review, in violation of his constitutional right to appeal based on a complete record. La. Const. art. I, § 19; La. Const. art. V, § 10.
It is difficult to perceive the prejudice claims, in light of the fact that La.Rev. Stat. 14:30(1) defines first degree murder as the killing of a human being "when the offender has the specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... aggravated rape." (Emphasis added). The Statute reads disjunctively and does not require the state to further delimit the underlying felony. See generally Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 2496-2500, 115 L.Ed.2d 555 (1991) [in returning general verdicts, the jurors are not required to agree upon a single means of commission, nor are indictments required to specify which overt act was the means by which a crime was committed]. In the instant case, Defendant's *932 attempts to gain access to the grand jury transcripts appear to be geared more toward defeating La.Code Crim. Proc. art. 434 (secrecy of grand jury meetings) rather than curing any inability to prepare his defense. This assignment lacks merit.

Assignment of Error 31
In this assignment of error, Defendant asserts that the trial court erred in failing to grant the motion to suppress the identifications of Melissa Frame and Deborah Schwab. He further complains that the witnesses' in-court identifications of him should have been suppressed as tainted by the earlier suggestive identification procedures. At trial, Deputy Jeff Gurtner explained how the State learned of two possible witnesses. During the course of the investigation, the detectives went back out to the levee in the vicinity of the crime scene on the evening of July 26, 1996, exactly one week after the murder. Because people tend to be "creatures of habit," the detectives wanted to see if any persons who frequent the levee around dusk had perhaps seen anything the previous week, on the night of the murder. On July 26, 1996, Dep. Gurtner spoke with Melissa Frame and Deborah Schwab, who exercise almost every evening by walking on the levee, including July 19, 1996. Based on this information, Dep. Gurtner radioed Sgt. Dennis Thornton and Lt. Maggie Snow, who met the witnesses on the levee shortly thereafter for the purpose of viewing a photographic lineup. Defendant filed a pre-trial motion to suppress identification, which the trial court heard on April 3, 1997.
As a general matter, the defendant has the burden of proof on a motion to suppress an out-of-court identification. La.Code Crim. Proc. art. 703(D). To suppress an identification, a defendant must first prove that the identification procedure was suggestive. State v. Prudholm, 446 So.2d 729, 738 (La.1984). An identification procedure is suggestive if, during the procedure, the witness' attention is unduly focused on the defendant. State v. Robinson, 386 So.2d 1374, 1377 (La.1980). However, even when suggestiveness of the identification process is proven by the defendant or presumed by the court, the defendant must also show that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Prudholm, 446 So.2d at 738.
The Supreme Court held in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977), that despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a "very substantial likelihood of irreparable misidentification." Under Manson, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include: 1) the witness' opportunity to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Id.
In the instant case, Defendant complains that Deborah Schwab's identification was tentative, and thus, she should not have been permitted to testify. Further, Ms. Schwab admitted that she had seen some media coverage about the murder before viewing the photo lineup.
A transcript of the motion hearing reveals that Sgt. Thornton, Melissa Frame, and Deborah Schwab all testified. The officer displayed the six-person photographic lineup to the witnesses separately and in no way suggested that they make a selection. The detective further stated that Ms. Frame was positive in her identification, but Ms. Schwab was tentative, explaining that on a scale of one to ten, she was a "nine or a strong nine."
Ms. Frame testified that when she saw Defendant on the levee the evening of the murder she was as close as eight to ten feet from him. She described the lighting *933 conditions as "starting to get dark." She further stated that her attention was drawn to Defendant because he was walking back and forth nervously on the concrete wall. He did not "bother" them and there was no verbal communication between them. She indicated that she had an opportunity to get a good look at him. Ms. Frame further testified that she had not seen any television or newspaper coverage of the homicide.
Ms. Schwab testified that on the night of the homicide, she had an opportunity to view Defendant for a "few seconds" from a distance of about ten feet. Ms. Schwab said that Defendant stood out to her because he was fidgety and nervous. She also acknowledged that she had seen television coverage of the homicide in the preceding week. Both witnesses positively identified Defendant in court at the motion hearing and at trial.
Applying the Manson precepts, both witnesses noticed Defendant because of his nervousness. They had ample opportunity to view Defendant in the early evening light from a distance of about ten feet. Both witnesses exhibited a high degree of certainty in their identification of Defendant and made their identification one week after encountering him. Although Ms. Schwab admitted to having seen media coverage of the homicide, there is no indication in the transcript from the motion hearing or from trial that she selected Defendant's photograph based on any media input; rather, she chose him because he is the individual she observed acting nervous and fidgety on July 19, 1996. Based on the totality of the circumstances, no substantial likelihood of misidentification appears to exist. This assignment lacks merit.

Assignments of Error 9, 14, 18, 19, 20, 22, 23, 24, and 28
In these assignments, Defendant claims that the trial court erred by sustaining the State's challenge for cause as to nine prospective jurors, namely Ms. Sawhney, Ms. Sturtz, Mr. Goffner, Ms. Meunier, Ms. Briceno, Ms. Labit, Mr. McGivens, Ms. Jenkins, and Ms. Bergeron, when all responded to the effect that they could consider the death penalty.
A prospective juror is properly excluded for cause because of his/her views on capital punishment when the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Sullivan, 596 So.2d 177 (La.1992), rev'd on other grounds sub nom.; Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The basis of exclusion under La. Code.Crim. Proc. art. 798(2)(b), which incorporates the standard of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Witt. Witherspoon further dictates that a capital defendant's rights under the Sixth and Fourteenth Amendments to an impartial jury prohibits the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id. at 1777. Moreover, notwithstanding La.Code.Crim. Proc. art. 800(B), which states that a defendant cannot complain of an erroneous grant of a challenge to the state "unless the effect of such a ruling is the exercise by the state of more peremptory challenges than it is entitled to by law," the United States Supreme Court has consistently held that it is reversible error, not subject to harmless-error analysis, when a trial court erroneously excludes a potential juror who is Witherspoon-eligible, despite the fact that the state could have used a peremptory challenge to strike the potential juror. Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 2054, 95 L.Ed.2d 622 (1987); Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).
A review of the record demonstrates that the trial judge did not abuse his discretion in granting the state's challenges for cause as to each of the prospective *934 jurors in dispute. First, the State asked prospective juror, Ms. Sawhney, her view on the death penalty, to which she responded: "Personally, I don't believe in the death penalty. That my religiousnot religious, it's my personal belief." She further indicated that this was a longstanding view of hers and that she felt life imprisonment was a more appropriate penalty. In granting the state's challenge for cause, the trial judge noted that Ms. Sawhney "said she's against it."
Second, Defendant complains about the trial court granting the state's cause challenge as to Ms. Sturtz. During voir dire, she elaborated on her views about capital punishment: "Well, morally, I don't know about putting someone to death. A life sentence I could see, but death I really hesitate on that." The most defense counsel could get her to commit to was that "there may be" some circumstances in which she could consider the death penalty. In granting the state's challenge for cause, the trial judge cautioned the parties to look at Ms. Sturtz's voir dire responses as a whole, and throughout she was saying, "I can't, I can't, I can't, I can't, I can't" until finally, at the end, counsel gave her a scenario in which she said she may be able to consider.
The third prospective juror who Defendant claims that the trial court erred in excusing for cause was Mr. Goffner. At first he started out saying that he "believe[s] in the death penalty and the life sentence," but went on the admit that "it hard for me to take someone life, you know." He went on to tell the prosecutor, "if I was on the jury I couldn't vote this man, couldn't put him to death myself, you know." Mr. Goffner's responses soon became clear that he was the type of person who believes in the death penalty, so long as he is not personally involved with imposing it, as evidenced in the following colloquy:
If someone kill [sic] someone innocent for nothing, for nothing, I believe in it. I just, I couldn't go put the finger on it, yeah, kill him, you know, execute him. I believe he should have the death penalty. If he kills a person for nothing.
Counsel's attempts to rehabilitate Mr. Goffner yielded positive responses that he could put aside his personal beliefs and follow the judge's instructions. Nevertheless, the judge considered Mr. Goffner's voir dire responses as a whole and felt that he repeatedly said he could not impose the death penalty.
The fourth prospective juror Defendant claims that the trial court erred in granting the state's challenge for cause was Ms. Meunier, who stated at the outset: "I believe that in some cases the death penalty is warranted, but I don't think that I can impose that." She went on to say that she doubted she could ever vote for death and that this was a longstanding view. The judge granted the state's challenge for cause without hesitation.
Fifth, Defendant complains that the trial court erred in granting the state's challenge for cause as to Ms. Briceno, who initially indicated that she knew one of the defense attorneys from a Spanish Chamber of Commerce, but that would not affect her in the case. Her answers on the death penalty were non-committal, as shown in the following colloquy:
Ms. Morgan: And if we actually asked you to vote for death, could you do that?
Ms. Briceno: I don't know.
Ms. Morgan: You don't sound like you're too sure about that.
Ms. Briceno: I mean it's very difficult. It's very hard for me. I don't know. I'm very sensitive on that point.
When counsel tried to rehabilitate Ms. Briceno, she expressed a preference for life in prison, but when asked if she could consider both penalties of life and death, she answered, "Maybe." The trial judge granted the State's challenge for cause without hesitation.
The sixth prospective juror that Defendant claims the trial court granted the State cause challenge erroneously was Ms. *935 Labit. She told the prosecutor, "Well, I guess I've always been one of these people that I believe in the death penalty so long as I didn't have to make the decision." She then indicated that she "probably could if there was a lot of evidence" and the killing was deliberate. On further reflection, Ms. Labit expressed genuine concern about Defendant's age and the fact that she had grandsons about his age. She indicated that she might not be able to return a death verdict against this young man. The judge agreed with the State and granted its challenge for cause.
The seventh prospective juror about whom Defendant claims that the trial court erred in granting the state's cause challenge was Mr. McGivens. He expressed that when it comes to the death penalty, "I justI justit's a hard decision to make. I wouldn't want to make that decision ... and would probably [vote] for life." After counsel suggested a hypothetical in which an individual walked up and starts shooting five people in the head, he responded that he "probably" could consider imposing the death penalty. The judge indicated that since the juror had responded that the only way he could consider death was involving multiple victims, he would grant the state's cause challenge.
The eighth prospective juror Defendant takes issue with the trial court's grant of the state's cause challenge was Ms. Jenkins. She voiced the opinion that "I'm not in favor of the death penalty. I have a strong belief and I don't think killing another person is going to bring that person back." She further indicated that her views stem from a strong religious belief. But she went on to say, "That's not to say I wouldn't consider it, but I don't think my gut feeling would be not to do it." She continued that she would not feel comfortable or want any part of a decision in putting someone to death, but then indicated her views might change if her child was the victim. She again waffled and returned back to say that "I'm against it. So I may hold firm to I would be against it." In granting the state's challenge for cause, the trial judge noted that even though she vacillated a little, her true belief came out. No defense objection followed this ruling.
Finally, the ninth prospective juror whom Defendant contends that the trial court erred in granting the state's challenge for cause was Ms. Bergeron. She candidly admitted:
I really don't know. I always thought I was for the death penalty, but honestly, I don't know that I couldI almost feel like I would be playing God. I really don't know. I guess I've never sat on a jury before so I don'tI really can't tell you. I always thought I was, but I think when it comes down to having somebody's life in your hands, that's a very big responsibility.
Her responses never indicated anything stronger than a "possibly" for returning a death verdict. She finally acknowledged that part of her difficulty stemmed from the fact that she has four sons and Defendant could have been one of her children's friends. The trial judge granted the state's challenge without further comment.
In each of these instances, the prospective jurors expressed views that would prevent or substantially impair them from making impartial decisions as jurors, see Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. at 852, and thus, the trial court's decision to grant the state's challenges for cause as to each is supported by the record. These assignments are meritless.

CAPITAL SENTENCE REVIEW
Article 1, § 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. Under La.Code.Crim. Proc. art. 905.9 and La.S.Ct.R. 28, this court reviews every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; *936 and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has filed the Uniform Capital Sentence Report required by La. S.Ct.R. 28 § 3(a) and the Department of Public Safety and Correction submitted a Capital Sentence Investigation Report ("CSIR"). See La.S.Ct.R. 28 § 3(b). In addition, the State and Defendant each filed a Capital Sentence Review Memorandum.
These documents indicate that Defendant is a white male born on June 14, 1974 to the relationship of Cynthia Thibodeaux and Sammy Woods. Defendant was 21 years old at the time of the instant offense. He had little or no contact with his father throughout his life and was raised for the first few years of his life by his mother and her husband, Anthony Morvant. When Defendant was age five, his mother married Thomas West and abandoned him and his three younger siblings.[4] Defendant went to live with his maternal grandparents and later lived for about three years with his mother's sister in Marrero. He was reunited with his mother at age 11 and moved to Midland, Texas.
In school, Defendant showed some academic problems and began skipping school. He was placed in special education around eighth grade but dropped out of school by age 15. Defendant worked in various restaurants and in 1993 entered the Job Corps in Treasure Lake, Oklahoma. At the time of the instant offense, Defendant had recently moved back to Louisiana from Midland, Texas and had obtained employment as an offshore deckhand with Callie Towing Company.
Defendant has one child, Joshua Richards, approximately age seven, from a relationship with Starla Richards, who lives in Texas. She reported that Defendant has had no contact with his son in the past four years.
Defendant's mother reported that both she and Defendant were sexually abused by her father.[5] Defendant was also physically abused by Ms. Thibodeaux's husband, Thomas West, who was described at the penalty phase as a very sadistic individual. When Defendant was in second grade and while living with his aunt in Marrero, he was also sexually abused by an adult male neighbor and his older female cousin.
The CSIR lists two previous misdemeanor convictions while in Texas for possession of marijuana from 1996 for which Defendant received a fine and court costs.
While Defendant's sanity was not an issue in the case, the defense presented expert testimony at the guilt phase by Dr. Edward Shwery, a clinical psychologist, to the effect that the sexual and physical abuse Defendant endured in his formative years rendered him a passive and easily suggestible person. At the penalty phase, the defense presented two additional experts cataloging Defendant's years of abuse: Beth Denton, a forensic social worker, and Dr. Mark Cunningham, a clinical forensic psychologist. Defendant's IQ was listed in the medium range of 70-100. Dr. Cunningham testified that he referred Defendant for neuropsychological evaluation for brain damage, given his history of beatings by Tommy West and no brain damage was detected.
The State presented one aggravating circumstance, that Defendant killed Crystal Champagne during the perpetration or attempted perpetration of an aggravated rape. The jury agreed. La.Code.Crim. Proc. art. 905.4. The defense presented six witnesses at the penalty phase.

*937 PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS
In his Capital Sentence Review Memorandum, Defendant claims that his death sentence is excessive and was imposed under the arbitrary factor of racial prejudice, as evidenced by the discriminatory selection of his grand jury and its foreperson, and his petit jury. Defendant, who is white, stands convicted of killing a white victim. He argues that the intentional discrimination against people of color in the selection of the grand jury members, particularly the grand jury foreperson, as well as the intentional discrimination in the selection of the petit venire and the petit jury injected passion, prejudice and arbitrary factors into his capital trial.[6] However, all of these issues were addressed in depth above in the individual assignments of error and found to be without merit.

AGGRAVATING CIRCUMSTANCES
At trial, the State presented one aggravating circumstance: that the offender was engaged in the perpetration or attempted perpetration of an aggravated rape. La.Code.Crim. Proc. art. 905.4(A)(1). The jury found that the State proved the statutory aggravating circumstance of aggravated rape and the record fully supports such a finding. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, (1979). Even accepting Defendant's above-referenced claim that no physical, forensic, or trace evidence supported a finding of rape or attempted rape, the jury was entitled to consider Defendant's own confession in which he detailed that he killed Crystal while raping her. Consequently, Defendant's sentence of death is firmly grounded on the finding of this aggravating circumstance.

PROPORTIONALITY REVIEW
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987). This court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) [In case reversed on other grounds, dictum suggesting that death penalty disproportionate].
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d 1 (La.1979)
The state's Sentence Review Memorandum reveals that since 1976, 67 cases have originated as first degree murder charges in Jefferson Parish, including the Defendant's case, and of those, juries have recommended imposition of the death penalty 19 times, including the current case. The first case is that of Benjamin Berry, who fatally shot a law enforcement officer during a bank robbery. Berry was executed in 1987. State v. Berry, 391 So.2d 406 (La.1980), cert. denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981). The second case is that of Robert Sawyer, who killed the female victim by beating her and inflicting karate kicks. She was also scalded and set on fire, after twice being raped by co-defendant, Charles Lane. In March, 1993, Sawyer was executed by lethal injection. State v. Sawyer, 422 So.2d 95 (La.1982), cert. denied, *938 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984). The third case is that of Tyronne Lindsey, who killed a shopper in the Oakwood Mall parking lot. After numerous resentencings and a retrial, Lindsey was once again sentenced to death. State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). The fourth case is that of Jimmy Robinson who killed the husband of an apartment complex manager in her presence during an armed robbery. This court affirmed the conviction but vacated the death sentence and, on remand, Robinson received a sentence of life imprisonment without benefit of parole, probation, or suspension of sentence. State v. Robinson, 421 So.2d 229 (La.1982). The fifth case is that of Johnny Taylor who stabbed the victim multiple times and stole his car. Taylor was executed on February 29, 1984. State v. Taylor, 422 So.2d 109 (La.1982). The sixth case is that of Lane Nelson, who robbed and stabbed a transvestite who had picked him up hitchhiking to New Orleans. Before his death sentence was carried out, Nelson's conviction was reversed and on retrial, he was convicted of second degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. State v. Nelson, 459 So.2d 510 (La.1984). The seventh case is that of Leslie Lowenfield who shot and killed his ex-girlfriend, her daughter, her parents, and her then current boyfriend. This court affirmed the conviction and sentence. State v. Lowenfield, 495 So.2d 1245 (La. 1985), cert. denied, Lowenfield v. Louisiana, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). The eighth case is that of Glen Keith Weiland who stabbed his girlfriend and her ex-husband, killing the female victim. This court reversed Weiland's first degree murder conviction. State v. Weiland, 505 So.2d 702 (La.1987). On retrial the state amended the indictment to second degree murder. The jury subsequently convicted defendant of manslaughter and he was sentenced to 21 years imprisonment at hard labor. The ninth case is that of Robert Tassin, who shot two victims, one fatally, in the course of an armed robbery/drug deal. This court affirmed his conviction and sentence. State v. Tassin, 536 So.2d 402 (La.1988). The tenth case is that of Glen Seals, who killed a cab driver in the course of an armed robbery. This court affirmed his conviction and death sentence. State v. Seals, 95-0305 (La.11/25/96); 684 So.2d 368. The eleventh case is that of Manuel Ortiz, a murder-for-hire case in which the defendant employed a "hitman" to kill his wife and her friend. This court affirmed defendant's conviction and sentence. State v. Ortiz, 96-1609 (La.10/21/97); 701 So.2d 922. The twelfth case is that of Julius Lucky who shot two of his co-workers, one fatally, during the course of an armed robbery. This court recently affirmed his conviction and death sentence. State v. Lucky, 96-1687 (La.4/13/99); 750 So.2d 801. The thirteenth case is that of Edward Harris, who shot and killed two pedestrians in a drive-by shooting. State v. Harris, (appeal not yet filed before this court). The fourteenth case is that of Teddy Chester, who killed a cab driver during the course of an armed robbery. This court recently affirmed his conviction and death sentence. State v. Chester, 97-2790 (La.12/1/98); 724 So.2d 1276. The fifteenth case is that of Elzie Ball, who killed a Budweiser deliveryman during the course of an armed robbery. On May 23, 1997, Ball was convicted of first degree murder and sentenced to death. State v. Ball, (no appeal has been filed in this court as yet). The sixteenth case is that of Lawrence Jacobs and Roy Bridgewater, who committed a double murder of an adult male victim and his mother during the course of an aggravated burglary. The defendants were tried separately, convicted and each sentenced to death. State v. Bridgewater and Jacobs, (neither defendant has filed an appeal in this court as yet). The seventeenth case is that of Allen Snyder, who stabbed his wife and her new boyfriend, killing the boyfriend. This court recently conditionally affirmed his conviction and death sentence, but remanded *939 the case to the trial court for a retrospective determination of his competence to stand trial. If a retrospective determination cannot be made, or if it is determined that defendant was not competent at the time of trial, defendant shall be entitled to a new trial. State v. Snyder, 98-1078 (La. 4/14/99); 750 So.2d 832. The eighteenth case is that of Emmett Taylor, who killed a 69-year-old employee of Rhodes Drug Store, during an armed robbery attempt. State v. Taylor, 99-1311 (appeal pending before this court).
The brief outline of the cases above provides strong support for an argument that the death penalty imposed in this case is not disproportionate. Given the scarcity of comparable cases in Jefferson Parish, it is appropriate for this court to look beyond the 24th J.D.C. and conduct the proportionality review on a statewide basis. State v. Davis, 92-1623 (La.5/23/94); 637 So.2d 1012, 1030-31. Cases are legion in which this court has affirmed capital sentences based primarily on the jury's finding that the defendant killed during the perpetration or attempted perpetration of an aggravated rape. See, e.g., State v. Connolly, 96-1680 (La.7/1/97); 700 So.2d 810; State v. Comeaux, 93-2729 (La.7/1/97); 699 So.2d 16; State v. Martin, 93-0285 (La.10/17/94); 645 So.2d 190; State v. Wille, 595 So.2d 1149 (La.1992); State v. Lee, 559 So.2d 1310 (La.1990); State v. Copeland, 530 So.2d 526 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860, reh'g denied, 490 U.S. 1077, 109 S.Ct. 2092, 104 L.Ed.2d 655 (1989); State v. Eaton, 524 So.2d 1194 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807, rehg. denied, 489 U.S. 1061, 109 S.Ct. 1332, 103 L.Ed.2d 600 (1989); State v. Carmouche, 508 So.2d 792 (La.1987); State v. Williams, 490 So.2d 255 (La.1986); State v. Loyd, 489 So.2d 898 (La.1986) (fourth penalty phase hearing presently pending); State v. Jones, 474 So.2d 919 (La.1985); State v. Brogdon, 457 So.2d 616 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 reh'g denied, 473 U.S. 921, 105 S.Ct. 3547, 87 L.Ed.2d 670 (1985); State v. Watson, 449 So.2d 1321 (La.1984); State v. Rault, 445 So.2d 1203 (La.1984); State v. Celestine, 443 So.2d 1091 (La. 1983); State v. Flowers, 441 So.2d 707 (La.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984), rev'd, 779 F.2d 1115 (5th Cir.1986), remanded for new trial, 509 So.2d 588 (La.App. 5th Cir.1987)(conviction and life sentence affirmed); State v. Willie, 436 So.2d 553 (La.1983); State v. Moore, 414 So.2d 340 (La.1982). However, none of the death sentences, referenced above, rests solely on the aggravating circumstance of rape, as does Defendant's case. Although in some cases in which the jury found two aggravating circumstances of rape and heinousness, the court often pretermitted on the determination of heinousness, as the record fully supported the jury's finding of aggravated rape, leaving rape as the only aggravator. See State v. Carmouche, 508 So.2d 792 (La.1987); State v. Jones, 474 So.2d 919 (La.1985). Nevertheless, compared to these cases, it cannot be said that the death sentence in this case is disproportionate. Nothing in any of the post trial documents filed pursuant to La. S.Ct.R. 28 warrants reversal of Defendant's death sentence.

DECREE
For the reasons assigned herein, Defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the Defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the Defendant, having filed for and been denied certiorari, fails to petition the United Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La. Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. Rev. *940 Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the Defendant in any state postconviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
NOTES
[*] Marcus, J. not on panel. See Rule IV, Part 2, Section 3.
[1] Several assignments of error were not discussed in this opinion because they do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an appendix which will not be published but will comprise part of the record in this case.
[1] Defendant claims that the detectives persuaded him to confess to raping and killing Crystal Champagne by suggesting facts of the crime to him during interrogation
[2] See State v. Loyd, 96-1805 (La.2/13/97); 689 So.2d 1321, 1333 (La.1997), for the proposition that a defendant has opportunity to present evidence concerning the frequency and extent of the use of clemency power.
[3] Article 465(A)(31) provides for a short form indictment for first degree murder in the following format: A.B. committed first degree murder of C.D. See State v. Neslo, 433 So.2d 73, 81-82 (La.1983).
[4] Defendant and his siblings each had different fathers.
[5] Cynthia Thibodeaux was repeatedly raped by her father from age six through her teenage years. At age 12, she became pregnant by her father and had an abortion. Cynthia continued to "act out" sexually and was 16 when Defendant was born.
[6] Defendant argues that he is the first white Defendant in Jefferson Parish to be sentenced to death since Robert Tassin in 1987.