FREDERICKA HOMBERG WICKER, Judge.
 

 | .¿This is a criminal proceeding in which the defendant/appellant Dondi E. Chism appeals his armed robbery and first degree robbery convictions and sentences. He assigns as error the insufficiency of the evidence to convict him. For the following reasons, we affirm the convictions and sentences. Furthermore, error patent review shows that the commitment/minute entry should be corrected and we remand for correction.
 

 Procedural History
 

 The state filed a three-count Bill of Information charging Mr. Chism with two counts of armed robbery, in violation of La.R.S. 14:64 and one count of theft valued at over $500, in violation of La.R.S. 14:67. On December 10 and 11, 2007, a jury trial proceeded on Counts 1 and 2, the armed robberies. Count 1 charged the defendant with the armed robbery of Claudia Rodriguez allegedly occurring on |nApril 29, 2007. Count 2 charged him with the armed robbery of Alta Dickinson
 
 [1]
 
 allegedly occurring on May 9, 2007. A twelve-person jury found the defendant guilty of the lesser offense of first degree robbery as to Count 1 (Claudia Rodriguez) and guilty as charged of armed robbery as to Count 2 (Alta Dickinson). The defendant filed a motion for a new trial, which was denied on February 27, 2008. Thereafter, the defendant pleaded guilty to drug offenses in district court proceeding numbers 06-6620 and 06-6355. Those proceedings are not the subject of this appeal. In exchange for the pleas, the state agreed, among other things, to dismiss the theft charge in the instant matter. That date, the state entered a nolle prosequi as to Count 8 — the theft charge.
 

 After the defendant waived sentencing delays, the trial judge sentenced Mr. Chism to 20 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on Count 1 (first degree robbery of Claudia Rodriguez) and 40 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on Count 2 (armed robbery of Alta Dickinson). These sentences were ordered to run concurrently with each other and with the sentences in case numbers 06-6355 and 06-6620. The trial judge denied the defendant’s oral motion to reconsider the sentences in the present matter. The defendant filed a written motion to reconsider the sentence as excessive, which was also denied that day. In
 
 *44
 
 addition, he filed a motion for appeal that the trial judge granted that day.
 

 Facts
 

 In April and May, 2007 robberies occurred at two Jefferson Parish businesses within an eight-day period.
 

 The first robbery occurred on April 29, 2007. Nicholas Martinez testified that he was working as a manager at Los Tres Amigos when it was robbed. The J^Mexican restaurant is located at 2201 La-palco Boulevard in Harvey. He was in the kitchen when a visibly shaken waiter entered the kitchen. Uncertain about what action he should take, Mr. Martinez walked to the front. He spotted a male with cash in his hands leaving the restaurant. The man had “a lot of ... ones and fives.” As manager he knew what kind of money he had in the register. But from his perspective, Mr. Martinez did not get a good view of the robber. Claudia Rodriguez was the cashier at the time. Ms. Rodriguez who was a friend of Mr. Martinez’s family, however, returned to Mexico after graduating from high school a few months before trial.
 

 The second robbery occurred on May 9, 2007. Alta Dickinson testified that at approximately 4:05 p.m., she was working as a bartender at the Daiquiri Dock when she was robbed at gunpoint. Before the robbery, she went to the bathroom. A customer told her that in her absence a man had briefly entered the bar and looked around. When the customer told the individual that Ms. Dickinson was in the bathroom, the individual left the bar.
 

 After she returned to the bar, Wayne R. Fussell, another customer, entered. Then the robber entered. After entering and ordering “the largest, strongest daiquiri,” the robber came behind the bar with a gun and kept threatening to kill her. She described the gun as “shiny silver.” She explained that the robber tried to get the cash in the video poker bank first, but it was locked and bolted down. The robber screamed at her and caused bottles to fall and break in his frustration when he could not open the box. Next, he demanded that she open the cash register. She complied, and the robber took cash with the exception of “ones” and change. Then he demanded that she unplug the register. She pleaded with him to take the money and leave. She believed that he was going to kill her.
 

 | ñAfter the man left, the police arrived quickly after a customer alerted them. A few days later, Ms. Dickinson immediately identified the defendant as the robber in a photographic lineup.
 

 She testified that there was a surveillance video at the time of the robbery that was turned over to the Sheriffs Office. She identified two photographs that depicted the incident. She described one photo as showing the robber pointing a gun at her while she opened the register. She described the second photo as showing the robber walking into the bar. The photos depicted the robber wearing a baseball cap.
 

 Sergeant Dax Russo testified that he is the video analyst for the Jefferson Parish Sheriffs Office who participated in the investigation of the robbery at the Daiquiri Dock. Sergeant Russo “digitized” two V.H.S. videotapes from the business and prepared them for viewing. He also made the two still photographs that the prosecutor showed to Ms. Dickinson. Sergeant Russo identified the three-minute portion of the videotape, which the prosecutor played for the jury.
 
 [2]
 

 
 *45
 
 Mr. Fussell testified that he saw a man at the cash register holding what appeared to be a silver gun. The man pointed the gun at the register. He demanded that the register be opened. He said “I’ll kill you.” Mr. Fussell asked him not to kill the woman. He testified that he could not identify the robber because he was not paying attention to his face.
 

 Robert Jackson testified that he was with the defendant near the Daiquiri Dock on the day of the robbery. He identified the defendant in court as someone he knew by the name of “Cadillac.” He knew the defendant for approximately one year. On May 9, 2007, he was driving a car in which the defendant was a | (¡passenger. He drove to a business within the proximity of the Daiquiri Dock. They had just obtained drugs and were going to get daiquiris. It was the defendant’s idea to go to the Daiquiri Dock.
 

 Mr. Jackson did not know that a crime was going to be committed there. After the defendant left the Daiquiri Dock, the defendant jumped into the back seat and told Mr. Jackson to drive. The defendant did not have any daiquiris. The front seat of the vehicle was vacant. At some point while driving, Mr. Jackson spotted a chrome-plated pistol and money. He saw the money on the back seat of the car. When they arrived at them destination, they began counting the money. The defendant offered him money but he did not take any. Four hours later, Mr. Jackson told a friend — a federal bounty hunter— that he knew about the Daiquiri Dock incident. His friend contacted Sergeant John Carroll of the Sheriffs Office. Mr. Jackson gave the information to Sergeant Carroll. That same night, he was shown a photographic lineup in which he identified the defendant.
 

 On the day after the Daiquiri Dock robbery, the defendant gave two statements to the police in which he admitted committing the robberies after waiving his
 
 Mi
 
 randa
 
 [3]
 
 constitutional rights.
 

 The first nine-minute audiotaped statement that was introduced into evidence reveals that it was taken at 9:22 p.m. by Sergeant Larry Dyess. Lieutenant Bruce Harrison was also present.
 

 The defendant was referred to an investigation of an incident occurring on May 9, 2007 concerning a bar room. The defendant stated that the bar room was a daiquiri house. He said that he was driven there by “Robert.” At the time, the defendant was wearing a red hat and brown shades. He stated that he walked into the business twice. When he first walked in, someone told him that the female ^employee was in the bathroom. The defendant left at that point. But, he entered a second time. He told the woman that he would like a large, strong daiquiri. When she began preparing the drink, the defendant pulled out a gray toy gun that looked like a .380 and told her to give him the box. He had been in the bar before that date and had observed the woman cash tickets from the poker machine by opening this gray box. The box was located behind the bar about two feet from the cash register. But, when he grabbed the box, it would not budge. He wanted money badly because he wanted drugs. He told the woman to open the box or he would shoot her. She begged him not to shoot her. She told him that the box was never released. After that, the defendant took
 
 *46
 
 $277 out of the cash register and ran out. He hopped into the backseat of the car, laid down, and told Robert to drive off. The robbery was the defendant’s idea. Robert knew nothing about it. Before entering the car, he told Robert that he was going to go in there and take money. Then he would lay down in the back seat and Robert would just drive off. He gave Robert $70. The statement was concluded at 9:31 p.m.
 

 Sergeant Dyess testified that after the defendant gave the audiotaped statement, the defendant agreed to continue speaking to the officer. During this period, the officer questioned the defendant regarding the Los Tres Amigos incident. The defendant gave additional information. The officer then took a second audiotaped statement from the defendant. The reason the officer separated the two statements was because often cases are not tried together and separating the two cases would facilitate their use in court. The second statement involved the Los Tres Amigos incident. He identified the audiotape and the transcription of that statement. The prosecutor played the audiotape to the jury while the jury read along with the transcript. The second tape-recorded statement began at 10:04 p.m. Thus, there was approximately a half hour between the two statements. During |8that half hour, the officer asked the defendant questions about the Los Tres Amigos incident.
 

 The second approximate five-minute statement, which was also taken in the presence of Lieutenant Bruce Harrison, contained a preliminary discussion concerning the waiver of rights. The defendant stated he agreed to cooperate and answer questions. He understood his statement was being recorded. Sergeant Dyess referred to the incident at the restaurant. The defendant stated he thought the restaurant serves Mexican food. The restaurant was located on Lapalco. Once again, the defendant was craving drugs and had no money. He had a black BB gun that was broken. He went straight to the cash register and approached a woman who was working there. He thought she was Mexican. He told her he needed change for a 10. He told her to open the cash register as he pulled the gun out and placed it on her head. He asked her to give him all of the money. It totaled approximately $417. Then he ran out the restaurant. The statement ended at 10:09 p.m.
 

 Sufficiency
 

 The defendant argues that the evidence was insufficient to support the convictions.
 

 “ ‘In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).... [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.’ ”
 
 State v. Hughes,
 
 05-0992, p. 5 (La.11/29/06), 943 So.2d 1047, 1051
 
 (quoting State v. Captville,
 
 448 So.2d 676, 678 (La.1984)). | ¡/‘Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, ‘assuming every fact to be proved that the evidence tends to prove.’ ”
 
 State v. Leger,
 
 05-0011, p. 91 (La.7/10/06), 936 So.2d 108, 170,
 
 cert. denied, Leger v. Louisiana,
 
 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (Citations omitted). “The statutory test of La. R.S. 15:438 ‘works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt
 
 *47
 
 beyond a reasonable doubt to a rational jury.’ ”
 
 Id.
 

 “The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La.R.S. 15:438.
 

 “Furthermore, when the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification.”
 
 State v. Hughes,
 
 05-0992, pp. 5-6 (La.11/29/06), 943 So.2d 1047, 1051 (Citations omitted). “Positive identification by one witness is sufficient to support a conviction.”
 
 Id.,
 
 05-0992 at 6, 943 So.2d at 1051.
 

 The defendant was found guilty of armed robbery as to Count 2 and was found guilty of the lesser charge of first degree robbery as to Count l.
 
 [4]
 

 The defendant does not argue that the state failed to prove the elements of the offenses. Rather, he contends there was insufficient evidence to prove that he was the perpetrator.
 

 Statements
 

 | inThe defendant did not specifically assign as error the trial judge’s denial of his motion to suppress his statements, although he argues the statements were coerced and involuntary. Since he did not raise the denial of the motion as error, we struggled to discern the defendant’s assigned error and arguments. We glean from his sufficiency argument that he is primarily challenging the jury’s credibility determination with regard to whether the statements were coerced. Although we have addressed the sufficiency error and the arguments
 
 in toto,
 
 the better practice would have been to raise the admissibility of the statements as an assignment of error. In its brief, the state noted the defendant’s failure to assign as error the admissibility of the statements while also arguing the statements were coerced. As a precaution, the state presented argument in a footnote to counter what it characterized as the defendant’s challenge that his statements were involuntary and improperly admitted. It is unclear from the defendant’s brief whether he makes such a claim, but, to the extent that he does, we hold that the trial judge did not abuse his discretion in admitting the statements.
 

 A trial judge’s ruling on the vol-untariness of a statement is given great weight and it will not be disturbed on review unless clearly unsupported by the evidence.
 
 State v. Vigne,
 
 01-2940, p. 6 (La.6/21/02), 820 So.2d 533, 537 (Citation omitted). In order to introduce a confession into evidence, the State must establish that the accused was advised of his constitutional rights.
 
 Id.
 
 Miranda
 
 [5]
 
 requires that before custodial interrogation, law enforcement officers must inform the subject of his right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford counsel, one will be appointed for him. The state has a heavy burden to demonstrate that the defendant
 
 *48
 
 knowingly and intelligently waived his privilege against selfjmcriminationn and his right to retained or appointed counsel.
 
 Id.
 
 Under La.R.S. 15:451, the state must prove the confession was free, voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises.
 

 At the suppression hearing, the state presented evidence to show that the defendant was sufficiently advised of his
 
 Miranda
 
 rights, that he understood the rights, and that he waived them before giving statements. The state also presented evidence that the statements were free, voluntary, and not made under the influence of force, coercion, intimidation, or promises. Therefore, the trial judge properly admitted the statements.
 

 On appeal, the defendant suggests that his statements were suspect given the circumstances under which they were obtained; namely, the police questioned him during a non-recorded pre-interview far longer than they questioned him during the audiotaped confessions. During closing arguments, defense counsel argued that the pre-interview took four times as long as the taped statements, suggesting that the officers coached the defendant.
 

 The jury heard testimony from Sergeant Larry Dyess and Lieutenant Bruce Harrison that the defendant, who executed a written waiver of his
 
 Miranda
 
 rights, was not coached or coerced during the time period within which they obtained pre-interview statements.
 

 Sergeant Dyess testified that during the approximate 42-minute period before the first recorded statement, he went over the waiver form with the defendant, fixed him a cup of coffee, asked if the defendant needed the bathroom, and discussed the case. During the 30-minute period between the first recorded statement and the second recorded statement, he denied that the defendant was | l¿coached and pointed out that there were discrepancies between the defendant’s and Mr. Jackson’s versions of the events.
 

 Lieutenant Bruce Harrison, who was present during the interviews, testified that he is presently the commander of the robbery section for the Jefferson Parish Sheriffs Office. He oversees investigations involving robberies. He explained that the audiotaped statement is used to corroborate any statements that are given by the defendant. Sometimes officers only have verbal statements because the defendants do not want to be recorded. He denied coaching the defendant. He testified that officers did not do that and that officers would not do that. It defeats the purpose of ensuring that the police have the right person if the police provide information to a suspect. Rather, officers want the suspect to tell them exactly what happened in order to confirm that the suspect is the right person. They do not want to put the wrong person in jail, especially if there is a pattern of robberies. If they put the wrong person in jail, the robberies continue.
 

 He explained that officers spend time talking to the suspect, getting to know him, and making him comfortable. Most people do not immediately make admissions. It also takes a few minutes to go over the rights form. In this case there was more than one offense that they were investigating. Additionally, the normal procedure is that officers spend time gathering case files and obtaining a tape recorder and a tape. Sometimes officers step outside to discuss who will take the taped statement and what questions they want to make sure they cover. He does a lot of investigations. He does not know exactly what happened on that evening. But he can say this is the normal proce-
 

 
 *49
 
 dure. He stated that absolutely no one ever prompted this defendant by feeding him information. He is able to say that that has never been done in his presence in the bureau.
 

 1 iaThe credibility of witnesses is within the sound discretion of the trier-of-fact, who may accept or reject, in whole or in part, the testimony of any witness.
 
 State v. McGinnis,
 
 04-1286, p. 15 (La.App. 5 Cir. 10/6/05), 917 So.2d 471, 481,
 
 unit denied,
 
 05-2469 (La.4/28/06), 927 So.2d 283. It is not the function of the appellate court to assess the credibility of witnesses or to reweigh the evidence.
 
 Id.
 
 The jury evidently credited the officer’s testimony.
 

 The jurors were made aware of the circumstances under which the defendant made the incriminating statements to the officers. It was the jury’s function to determine the credibility of those witnesses. The jurors were free to credit the testimony of the officers and to accept as true them accounts of the defendant’s confessions, as well as to accept as true the content of those confessions themselves.
 

 Clearly, the jury had an adequate basis for deciding the credibility issue against the defendant.
 

 Corpus Delicti
 

 The defendant argues that there was no eyewitness to the Los Tres Amigos Restaurant robbery. The thrust of his argument is that his confession could not be used as the sole means to support the conviction.
 

 The defendant admitted to the police that he robbed a restaurant he thought served Mexican food that was located on Lapalco while armed with a BB gun. He stated that he believed the female he robbed was Mexican. He also stated that he placed the gun on the victim’s head and demanded that she open the cash register. After taking approximately $417, he ran.
 

 Mr. Martinez, the manager of the Los Tres Amigos Restaurant, testified that the restaurant is located on Lapalco. Someone took cash from the cash register | l4when Claudia Rodriguez was working there as the cashier. Ms. Rodriguez did not testify.
 

 An accused “may not be convicted of a crime based solely on his own uncorroborated confession without some independent proof that a crime has been committed,” i.e. without proof of the
 
 corpus delicti. State v. Connolly,
 
 96-1680, p. 14 (La.7/1/97), 700 So.2d 810, 820 (Citations omitted). The purpose of the “corroboration rule” is to test the reliability of a confession, thus preventing an erroneous conviction based solely on an untrue confession.
 
 Id.
 
 “This trustworthiness approach provides the necessary minimum assurance against convictions based on untrue confessions.”
 
 State v. Martin,
 
 93-0285, p. 8 (La.10/17/94), 645 So.2d 190, 195,
 
 cert. denied, Martin v. Louisiana,
 
 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995).
 

 In order to fulfill the requirements of the
 
 corpus delicti
 
 rule, the state must prove (1) the injury specified in the crime occurred and (2) that the injury was caused by someone’s criminal activity involved in the charged crime.
 
 State v. Thibodeaux,
 
 98-1673, p. 12 (La.9/8/99), 750 So.2d 916, 927,
 
 cert. denied, Thibodeaux v. Louisiana,
 
 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000) (Citations omitted). “Corroborating evidence need only show the essential injury involved in the charged crime (e.g., death caused by criminal activity in a murder charge) in order to establish the reliability of the inculpatory statements of the accused; the corroborating evidence need not show every element in the definition of the charged crime (e.g., the predicate felony in a felony murder).”
 
 *50
 

 Martin, supra,
 
 93-0285 at 8, 645 So.2d at 195.
 

 “Martin
 
 removed any confusion over the scope of the rule by expressly holding that the state need not produce independent evidence corroborating every element of the crime admitted in the accused’s statement as long as it establishes hBthe commission of a criminal act.”
 
 Thibodeaux, supra,
 
 98-1673 at 12, 750 So.2d at 927.
 

 The
 
 corpus delicti
 
 must be proven by evidence which the jury may reasonably accept as establishing that fact beyond a reasonable doubt.
 
 State v. Willie,
 
 410 So.2d 1019, 1029 (La.1982) (Citations omitted). “This independent proof ... may be either direct or circumstantial in nature.”
 
 State v. Thibodeaux,
 
 98-1673, p. 12 (La.9/8/99), 750 So.2d 916, 926-27, cert
 
 denied, Thibodeaux v. Louisiana,
 
 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000) (Citations omitted).
 

 There is “no rule [that] requires the state to establish the
 
 corpus delicti
 
 by no other means than through the testimony of the victim of the crime.”
 
 State v. Lee,
 
 01-2082, pp. 6-7 (La.App. 4 Cir. 8/21/02), 826 So.2d 616, 623,
 
 writ denied,
 
 02-2549 (La.9/5/03), 852 So.2d 1019
 
 (cited, with approval in State v. Taylor,
 
 04-346 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 593).
 

 Moreover, proof that the defendant was the person who engaged in the unlawful conduct, although necessary for the conviction, is not an element of the
 
 corpus delicti. State v. Joseph,
 
 454 So.2d 237, 243 (La.App. 5 Cir.1984) (Citations omitted).
 

 But, “[suspicion, rumor, gossip, or mere hearsay evidence is not sufficient to establish the proof of
 
 corpus delicti
 
 [.]”
 
 State v. Brown,
 
 236 La. 562, 572, 108 So.2d 233, 236 (La.1959).
 

 We are mindful that the touchstone of the “corroboration rule” is to test the reliability of a confession, thus preventing an erroneous conviction based solely on an untrue confession.
 
 Connolly, supra,
 
 96-1680 at 14, 700 So.2d at. 820.
 

 In this case, the defendant’s confession was made voluntarily under trustworthy circumstances and there are no signs that the confession was false or | ^coerced. We consider these factors relevant to the degree of corroboration that is required.
 

 Here the state showed independent of the defendant’s admissions that someone committed the criminal act of taking the cash from the cash register at the time that Ms. Rodriguez was employed as a cashier in such a manner as to alarm the waiter. The defendant’s statement confirmed a material fact that a robbery occurred at the precise location of the restaurant robbery. It also provided details to explain why the waiter was visibly shaken, i.e., that the defendant placed a gun to Ms. Rodriguez’s head.
 

 To sum up, we conclude that given the reliability of the defendant’s statement, and the fact that the essential injury was corroborated independently of the defendant’s statement, the state proved independently of the defendant’s statement that the injury was caused by someone’s criminal activity. Therefore, the state fulfilled the requirements of the
 
 corpus de-licti
 
 rule.
 

 “Once the
 
 corpus delicti
 
 has been independently established, a confession alone may be used to identify the accused as the perpetrator of the crime.”
 
 State v. Celestine,
 
 452 So.2d 676, 678 (La.1984) (Citations omitted).
 

 Accordingly, there was sufficient corroborative evidence to establish the reliability of the defendant’s confession and to
 
 *51
 
 sustain a conviction as to the first degree robbery.
 

 Witness Credibility
 

 The defendant argues that there was insufficient evidence to convict him of the Daiquiri Dock robbery because the only identification — Ms. Dickinson’s — was suspect. And Mr. Jackson was biased.
 

 The defendant contends that Ms. Dickinson’s identification was suspect for these reasons: (1) Ms. Dickinson testified that the robber was taller than she but 117the jury discovered during trial that the defendant was shorter than Ms. Dickinson. (2) Ms. Dickinson testified that she had been previously robbed and was motivated to convict someone of this crime. (8) Ms. Dickinson testified that she was able to make an identification despite the fact that the perpetrator wore a baseball cap and sunglasses. (4) Ms. Dickinson’s identification is suspect because it appeared to be coached. (5) Ms. Dickenson had her back turned to the robber during the robbery.
 

 We first consider the defendant’s arguments regarding Ms. Dickinson’s identification.
 

 It is undisputed that the robber’s face was not fully concealed. Ms. Dickinson explained that she had a good view of the robber. She described the perpetrator as wearing a baseball cap and sunglasses. She had no doubt that the person she identified in the photo array was the robber. Despite the fact that no person in the lineup wore sunglasses and a baseball cap, she was still able to make an identification. She explained that she also noticed the shape of the perpetrator’s face, forehead, cheeks, and lips as well as his age and height. He seemed to be her height of 5'8" or a few inches taller than she and in his early to mid '40’s. She explained, however, that she was in a fetal position and the robber was a couple of inches taller than she was at that point. In addition, she noticed his wide nose. Ms. Dickinson made an in-eourt identification of the defendant as the robber.
 

 The defendant argues that Ms. Dickinson began to discuss various features about her perpetrator, because she focused on the defendant’s face in court while she described the robber. However, the in-court identification was not the first time that Ms. Dickinson identified the defendant. Ms. Dickinson had previously identified the defendant in a photographic lineup.
 

 Sergeant Dyess testified that he did not recall the defendant’s height. During closing, defense counsel also argued that the jury could see the defendant was not | |Htaller than 5'8" as Ms. Dickinson had stated. During closing argument, defense counsel argued that the jury could see that the defendant was not taller than 5'8". However, “[c]losing arguments are not evidence to be considered by the jury.”
 
 State v. Boatner,
 
 03-0485, p. 7 (La.12/3/03), 861 So.2d 149, 154. Here, Ms. Dickinson explained that her estimate of the robber’s height was based on her fetal position and at that time the robber was taller than she. Thus, evidently she could not get an accurate description of the robber’s height from her position.
 

 During cross-examination, Ms. Dickinson testified that she had been previously robbed. When asked whether she wanted to make certain someone was apprehended this time, she replied that she wanted to see that the man who robbed her did not do it again. The jury could have reasonably concluded that she had no personal bias against the defendant but only wanted to make certain that the proper person was apprehended.
 

 The defendant also argues that during cross-examination, Ms. Dickinson testified that the video accurately depicted what
 
 *52
 
 took place in the bar on the date of this robbery. But, a video had not been shown to her when she made this statement. Thus, this indicates that she was coached before she gave her testimony.
 

 At trial, in response to the state’s questions, Ms. Dickinson replied that the video accurately depicted what took place that day. However, prior to that she was shown still photographs from the video. During cross-examination, defense counsel referred to her statement that the video properly depicted what happened that day. She explained that those were pictures from the video and she did not understand counsel’s question.
 

 Since Ms. Dickinson had not been shown the actual video, the jury could have reasonably interpreted her response to mean that she was referring to the two Instill photographs as accurately depicting the incident. Thus, the jury could have reasonably concluded that there was no evidence that the prosecutor coached her.
 

 The defendant notes that in the still photographs, Ms. Dickenson had her back turned to the robber during the incident and therefore she could not have identified him. At trial, Ms. Dickinson testified that the pictures showed the robber having his back to her. But, she never testified his back was to her the entire time. In fact, through her testimony and the defendant’s statement, there was evidence to the contrary. The defendant approached Ms. Dickinson and ordered a large daiquiri. The jury could have reasonably inferred that during that exchange, Ms. Dickinson had a good view of the robber.
 

 Most notably, Ms. Dickinson stressed that she was positive that the defendant was the man and she positively identified him from a lineup. Given these facts, and the jury’s reasonable credibility determinations, the jury was entitled to find that the defendant was the robber.
 

 We now consider the defendant’s arguments as to Mr. Jackson’s alleged bias.
 

 The defendant argues that the jury’s reliance on Mr. Jackson’s testimony was misplaced because he had pending drug charges against him that were scheduled to be dismissed once he testified against the defendant.
 

 Mr. Jackson testified that he had no prior convictions. He was presently incarcerated because he had a cocaine distribution charge in another division of the Jefferson Parish Court. The prosecutor who handled the defendant’s case was not the prosecutor handling Mr. Jackson’s case. According to Mr. Jackson, his case was going to be dismissed the day of trial because the District Attorney, the judge, and the court officers all agreed that the videotape did not show that he was the offender.
 

 lapHe also testified that at the time he met with Sergeant Carroll, he had not been arrested for his current drug charge.
 

 During cross-examination, trial counsel questioned Mr. Jackson about the fact that it seemed a coincidence that he was going to have the charge dismissed the same date that he was testifying against the defendant. Mr. Jackson responded that he did not view the dismissal as a coincidence. Rather, the drug charge in that case was being dismissed because the videotape did not show that he was the perpetrator. During redirect examination, he explained that the videotape was only played the week before this trial.
 

 Most notably, Mr. Jackson’s description of the Daiquiri Dock robbery substantially matched that given by the defendant. Given these facts, and the jury’s reasonable credibility determination to credit Mr.
 
 *53
 
 Jackson’s testimony, the jury was entitled to find that the defendant was the robber.
 

 Jury Deliberations
 

 At some point during the deliberations, the jury requested the transcripts of the defendant’s statements as well as the au-diotaped interview. The defendant argues that the jury had misgivings about the evidence because the trial judge simply reread the jury instructions rather than allow the jury to view the evidence during deliberations. He asserts that this approach did not clarify any misgivings the jury had about the evidence. Thus, the jury misapplied the law when it returned a guilty verdict.
 

 The defendant did not assign as error the trial judge’s failure to allow the jury to view this evidence during its deliberations, nor did trial counsel object to the court’s ruling. During trial, trial counsel agreed that the jury could not take the transcripts into the jury room. The thrust of appellate counsel’s argument is that the jury misapplied the law because the jury had “misgivings.”
 

 DiLa.C.E. art. 606(B) prohibits a juror from testifying “as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon his or any other juror’s mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith!.]”
 
 [6]
 
 Therefore, a court is generally prohibited from considering the jury’s state of mind.
 

 The proper standard is the
 
 Jackson v. Virginia
 
 standard for sufficiency of the evidence.
 

 Under the
 
 Jackson v. Virginia
 
 standard, we find that viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have determined beyond a reasonable doubt that the defendant committed the armed robbery at the Daiquiri Dock.
 

 Error Patent
 

 The record was reviewed for errors patent, according to La.C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990).
 

 We note that there is a difference between the commitment/minute entry and the sentencing transcript regarding the defendant’s sentences. The transcript prevails when there is a discrepancy between the minutes and the transcript.
 
 State v. Lynch,
 
 441 So.2d 732, 734 (La. 1983).
 

 Although the commitment/minute entry correctly reflects that the sentences were to run concurrently with case numbers 06-6355 and 06-6620, it incorrectly states that the sentences are to run concurrently “as well as with any and all other ^sentences presently serving.” The district court is directed to delete the above-quoted phrase in the commitment/minute entry.
 

 The clerk of court is directed to transmit the original of the minute entry/commitment to the officer in charge of the institution to which the defendant has been committed.
 
 See, State ex rel. Roland v. State,
 
 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam).
 

 Accordingly, it is ordered that the defendant’s convictions and sentences are affirmed. We further order that this case be remanded to allow the trial court to
 
 *54
 
 amend the commitment/minute entry as directed above.
 

 CONVICTIONS AND SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS.
 

 [1]
 

 . Ms. Dickinson is also referred to as "Alta P. Dickinson” in the transcript.
 

 [2]
 

 . We have reviewed the digitized videotape. It shows an individual, who is wearing a cap, pointing what appears to be a weapon at a woman at the bar. It also shows this individ
 
 *45
 
 ual hurriedly placing what appears to be cash in his pockets. The videotape does not, however, provide enough detail to accurately identify the perpetrator.
 

 [3]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).
 

 [4]
 

 . Under La.R.S. I4:64(A), armed robbery is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.” Under La.R.S. 14:64.1(A), first degree robbery is defined as "the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon.”
 

 [5]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).
 

 [6]
 

 . The exception is that "a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention.” La. C.E. art. 606(B).