MARC E. JOHNSON, Judge.
^Defendant, Joshua Thomas, appeals his conviction from the 24th Judicial District Court by contesting the constitutionality of LSA-C.Cr.P. 782 and by alleging trial court error regarding the jury instructions. For the following reasons, we affirm defendant’s convictions and sentences.
FACTS AND PROCEDURAL HISTORY
Defendant was charged by bill of information with two counts of armed robbery (LSA-R.S. 14:64), one count of attempted armed robbery (LSA-R.S. 14:27:64), and one count of aggravated battery (LSA-R.S. 14:34). Michael Jacobs and Shawn Martin were charged as co-defendants on all counts with the exception of the aggravated battery.[1] Defendant pled not guilty at arraignment.
Defense counsel filed a motion to quash the bill of information, arguing that LSA-C.Cr.P. art. 782 A, which allows for a non-unanimous jury verdict for hard | ^.felonies, is unconstitutional. On August 24, 2009, the trial court heard arguments on the motion and denied it.[2]
Defendant was tried individually by a 12-person jury on August 25-26, 2009.[3] The jury returned verdicts of guilty as charged on all four counts. Defendant filed timely motions for new trial and post-verdict judgment of acquittal. The trial court denied both motions on September 10, 2009. Defendant waived statutory delays. The court sentenced him that day to 40 years at hard labor on each count of armed robbery (counts 1 and 2), 20 years at hard labor on the attempted armed robbery (count 3), and 10 years at hard labor on the aggravated battery (count 4). The court directed that all of the sentences run concurrently with each other, and that they all be served without benefit of parole, probation, or suspension of sentence.
*681 Defendant timely made an oral motion for appeal. He also filed a written appeal motion, which the trial court granted on September 10, 2009. The State filed a habitual offender bill of information, seeking to enhance defendant’s sentence on count 1, armed robbery. The habitual offender proceedings are part of a separate appeal in companion case 10-KA-221.
Defendant noticed his intention to file a pro se supplemental brief in his appeal. In an Order dated May 19, 2010, this Court granted him until June 17, 2010 to file a pro se brief. Defendant failed to file a supplemental brief.
Count 1
Herman Melerine, age 82, testified that on February 26, 2008, he went to Boom-town Casino. He parked his car about ten parking spaces from the casino’s entrance. He later left the casino with $1,800 he had won playing craps. While |4Mr. Melerine was walking back to his car, a man approached him and demanded his money. The man had a large pistol in a holster attached to his belt. Mr. Melerine gave the man his wallet, which contained seven $100 bills; his driver’s license, and an old credit card he had never activated or used. The man then demanded Mr. Melerine’s cellular telephone. Mr. Melerine told him he did not have his phone with him. The man told Mr. Melerine to give him his car keys, and the victim complied. The perpetrator left the scene, and Mr. Melerine did not see where he went.
Mr. Melerine testified that he told some passersby about the robbery, and they called casino security. A security guard, in turn, called police. Mr. Melerine described the robber as a light complected African-American man, a bit taller than his own height of 5' 6". Aside from those details, Mr. Melerine did not recall what the perpetrator looked like. Although police showed him photographic lineups, he was unable to identify anyone.
Mr. Melerine stated that sometime after the robbery, Chase, the issuer of his stolen credit card, notified him that someone had attempted to use the card at a Foot Locker store. He did not give anyone permission to use the card.
Kishon Fernandez testified she works as a cashier at Foot Locker on Canal Street in New Orleans. There is a Kids Foot Locker next door. On February 26, 2008, three men came into the store and asked for Rebekah Simon, a store manager. Ms. Simon was not working that day, so Ms. Fernandez waited on the men. They attempted to buy five pairs of shoes with a credit card.
Police later showed Ms. Fernandez surveillance videotape from the store, and she was able to point out the man who attempted to use the credit card. Police also showed her a still photograph taken from the surveillance tape. She testified that the man in the photograph wearing a striped shirt was the one who asked for |Rthe store manager. Police also showed Ms. Simon a photographic lineup, from which she was able to identify one of the three men who came into the store. Ms. Simon testified she did not recognize defendant as one of the men.
Rebekah Simon testified she was once employed as an assistant manager at Kids Foot Locker on Canal Street. She did not work on February 26, 2008, but Kishon Fernandez told her someone came into the store and asked for her that day. Police asked Ms. Fernandez to view surveillance videotape that showed three men who were in Foot Locker and Kids Foot Locker. She also looked at the still photograph taken from the videotape. She identified one of the men as Michael Jacobs, a friend she had known since childhood. She identified a second man as Mr. Jacobs’ friend, *682 Shawn. She testified that Mr. Jacobs was the one in the striped shirt, and Shawn was pictured wearing a green shirt and a hat. Ms. Simon did not recognize the third man. Ms. Simon identified Mr. Jacobs from a photographic lineup on March 4, 2008. At the request of investigating officers, Ms. Simon attempted to locate Mr. Jacobs. She told his mother about the police investigation, and his mother then put Mr. Jacobs in touch with detectives.
Count 2
Amin Joudeh testified he played slot machines at Boomtown Casino on February 29, 2008. He won about $3,200.00. He collected his winnings and walked to his car, which was parked in the parking space closest to the casino’s side entrance. When he got to his car, a man he had never seen before jumped from behind him and asked him for a cigarette. Mr. Jou-deh told the man he did not smoke. He then got into his car and headed to his home in Gretna. It was just before midnight.
As he neared his house, Mr. Joudeh noticed there was a car following closely behind him. Since it was dark he could not see who was inside the car, but |fihe suspected the occupants were up to no good. Mr. Joudeh pulled his car to the side of the street one and one-half blocks from his house. The car that was following Mr. Joudeh rode past him and pulled into a driveway two doors down from his house. Mr. Joudeh pulled into his driveway and walked toward the front door of his residence. A man immediately approached him with a gun and said, “Give me your money.” Mr. Joudeh recognized him as the man who approached him in the Boomtown parking lot. Mr. Joudeh said, “What the hell you doing; is you crazy or something?” The man responded by cocking his gun.
Mr. Joudeh gave the gunman $520 in $20 bills from his pants pocket. He did not hand over several $100 bills that were in his jacket. The perpetrator’s car pulled up in front of Mr. Joudeh’s house. Mr. Joudeh could not see the occupants. The gunman ordered Mr. Joudeh to give him his car keys. The victim complied, and the perpetrators rode away.
After the incident, Mr. Joudeh called police. An officer showed him a photographic lineup on March 10, 2008, and he identified Shawn Martin as the man who robbed him at gunpoint. On cross-examination, Mr. Joudeh testified he did not see defendant at any time during the incident.
Counts 3 and 4
Deputy Jessica Cook of the Jefferson Parish Sheriffs Office testified that at 10:05 a.m. on February 29, 2008, she responded to an attempted robbery/aggravated battery call at 2637 Centaur Street in Harvey. When she arrived, she met with the victim, 72-year-old Rodney Ory. Deputy Cook learned Mr. Ory was attacked in front of his residence upon returning from Boomtown Casino. Mr. Ory had a laceration on his head, and he was treated at the scene by personnel from West Jefferson Medical Center. Deputy Cook identified State’s Exhibits 4, 5, and 6 as photographs of Mr. Ory’s injuries.
17Sergeant John Carroll, the lead investigator on the case, testified Mr. Ory died sometime between the time of the incident and the time of trial, but his death had nothing to do with the injuries he sustained in the attack.
Police investigation
Sergeant Carroll testified he investigated all of the offenses charged in this case. He consulted with Boomtown Casino security and reviewed surveillance videotapes to determine whether a suspect could be seen following Mr. Melerine or Mr. Joudeh *683 out of the casino before they were robbed. The surveillance footage from February 26, 2008, offered the officer no leads on suspects as to Mr. Melerine’s robbery, because there were too many people in the casino to determine whether any one individual was following the victim.
In the surveillance footage from February 29, 2008, Sergeant Carroll pinpointed an individual who left the casino at the same time as Mr. Joudeh. It appeared the man was following the victim out while talking on a cellular telephone. Since Boomtown Casino routinely asks for identification from anyone age 35 or younger, Sergeant Carroll inspected the surveillance video and was able to find when that subject entered the casino and swiped his driver’s license at the security post. He then checked the casino’s security log, and found Michael Jacobs’ name entered under February 29, 2008. At that point, Mr. Jacobs was a person of interest in the investigation.
Sergeant Carroll identified State’s Exhibits 8 and 9 as the VHS surveillance tapes he obtained from Boomtown. They contain the footage of Mr. Joudeh and Michael Jacobs. The videotapes were played for the jury while Sergeant Carroll pointed out Mr. Joudeh’s and Mr. Jacobs’ activities.
While Sergeant Carroll was reviewing the Boomtown security tapes, he learned that Mr. Ory had been the victim of an attempted robbery on February 29, | s2008. The incident piqued Carroll’s interest, since Mr. Ory had been accosted at his home after winning $1,200.00 at Boom-town. Interest in Michael Jacobs as a suspect grew when Rebekah Simon identified him in the surveillance tape from Foot Locker. Mr. Melerine was robbed of his credit card at 3:30 p.m. on February 26, 2008, and Mr. Jacobs attempted to use the card at Foot Locker at 4:38 p.m. that day. Ms. Simon and Ms. Fernandez also identified Jacobs in a photographic lineup as one of the three men who made a purchase with Mr. Melerine’s credit card.[4] Sergeant Carroll testified that he eventually learned the two men with Mr. Jacobs at Foot Locker were Shawn Martin and defendant.
Sergeant Carroll testified that he got a message to Michael Jacobs through Ms. Simon, and Mr. Jacobs contacted him at his office on March 7, 2008. On that day Sergeant Carroll picked up Jacobs and defendant, who was with him. He transported the men to the Jefferson Parish Detective Bureau. Sergeant Carroll interviewed Mr. Jacobs after advising him of his rights. Mr. Jacobs confessed to participating in the two armed robberies and the attempted armed robbery, and Sergeant Carroll placed him under arrest. Detective Brett Beavers interviewed defendant separately.
Based on information he obtained from the interviews, Sergeant Carroll obtained an arrest warrant for Shawn Martin. Mr. Martin was not at his last known address in New Orleans when Sergeant Carroll arrived there, but Martin’s step-father, Irvin Clemons, consented to a search of the residence. Sergeant Carroll recovered a green polo shirt identical to the one Mr. Martin was wearing in the Foot Locker surveillance video. Mr. Joudeh identified Mr. Martin in a photographic lineup as the gunman in his robbery.
19While Sergeant Carroll did not interview defendant, he familiarized himself with the statements defendant made to Detective Beavers. Based on defendant’s statements, it was Sergeant Carroll’s un *684 derstanding that defendant was the driver in the Melerine robbery, while Mr. Martin was the gunman and Mr. Jacobs was the one inside the casino. As to the Joudeh robbery, Mr. Martin was the gunman, defendant was the driver, and Mr. Jacobs was the lookout in the casino. As to the Ory incident, Mr. Jacobs was the lookout, Mr. Martin was the driver, and defendant was the gunman.
Detective Beavers testified that he assisted Sergeant Carroll in picking up Michael Jacobs and defendant on Constantinople Street in New Orleans. He interviewed defendant at the detective bureau after advising him of his rights. Detective Beavers conducted four separate interviews with defendant. Each was tape recorded, and the recordings were transcribed. The recordings were played for the jury.
Detective Beavers testified that defendant identified Michael Jacobs and Shawn Martin in the photographic lineups. Defendant also identified himself, Mr. Martin, and Mr. Jacobs in the still photograph taken from the Foot Locker surveillance tape.
In the first of his four interviews with Detective Beavers, defendant said he was at Boomtown Casino with Mike Jacobs and Shawn Martin on February 29, 2008. Defendant and Jacobs played blackjack, and they lost some money. Mr. Jacobs stayed inside the casino while defendant and Mr. Martin waited in the car in the parking lot. Mr. Jacobs phoned defendant to say he had seen an elderly man cashing out at a teller window, and that the man was on his way out of the casino. Defendant stated that he and his two companions followed the man home. Mr. Martin drove the car.
|inThe man parked in his driveway and exited his car. Defendant and Mr. Jacobs got out of their car. Defendant was carrying a BB gun that belonged to Mr. Martin. Defendant demanded the elderly man’s money, and the man began yelling. Defendant hit the man on the head with the gun and fled the scene. Defendant explained to Detective Beavers that he was unemployed and had a gambling problem, and he was having trouble making ends meet.
In the second interview, which began minutes after the first ended, Detective Beavers questioned defendant about the Joudeh robbery. Defendant stated that he and Mr. Jacobs lost their money gambling at Boomtown, and they were frustrated. Afterwards, while defendant and Mr. Martin waited in the car, Mr. Jacobs saw an “Indian guy” cashing in his winnings, and he phoned defendant to alert him. In the parking lot, Mr. Martin approached the man and asked him for a cigarette. There were people nearby, so nothing happened in the parking lot. They followed the man to his house, where Mr. Martin took more than $500 from him at gunpoint. Defendant said he was driving the car on that occasion.
In the third interview, Detective Beavers questioned defendant about the Mele-rine robbery. Defendant said that in that instance Mr. Jacobs went into Boomtown Casino and saw a man cashing in $2,500 in winnings. Mr. Jacobs phoned defendant and described the man to him. When the man exited the casino, Mr. Martin approached him and took his cars keys, wallet, and cash at gunpoint. They threw the car keys in the river and defendant and Martin split the victim’s money. They told Mr. Jacobs they had not recovered any money from the victim. On that occasion defendant was driving the car.
Defendant stated that he, Mr. Martin, and Mr. Jacobs attempted to buy shoes at Foot Locker with a stolen credit card. After the card was declined several times, *685 defendant left the store and waited in the car for the other two.
|nIn the fourth interview, Detective Beavers asked defendant to clarify some details regarding the offenses. The officer also showed defendant two photographic lineups, from which he identified Michael Jacobs and Shawn Martin.
ASSIGNMENTS OF ERROR

ASSIGNMENT OF ERROR NUMBER ONE

The defendant’s motion to quash based upon the constitutionality of Article 782 of the Code of Criminal Procedure was wrongfully denied.

DISCUSSION

Defendant argues the trial court erred in denying his pre-trial motion to quash the bill of information, in which he argued LSA-C.Cr.P. art. 782 is unconstitutional.[5] Defendant concedes that the Louisiana Supreme Court has addressed the issue, holding that the article is constitutional. Defendant nevertheless raised the issue in hopes that the United States Supreme Court would soon reverse longstanding jurisprudence and find non-unanimous jury verdicts unconstitutional. The State responds that defendant’s argument is unfounded, pointing out that the United States Supreme Court recently denied cer-tiorari in a case involving the constitutionality of non-unanimous verdicts.
LSA-C.Cr.P. art. 782 A provides, in part, “Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.” The United States Supreme Court has long held that non-unanimous juries do not violate a defendant’s Sixth Amendment right to trial by jury, made applicable to the states by the Fourteenth Amendment. Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972). In State v. Belgard, 410 So.2d 720, 726 (La.1982), the Louisiana Supreme Court followed the United States Supreme Court’s jurisprudence, explaining that “[t]his court has consistently held C.Cr.P. art. 782 does not violate the Sixth or Fourteenth Amendments to the United States Constitution.”
Recently, in State v. Bertrand, 08-2215, p. 8 (La.3/17/09); 6 So.3d 738, 743, the Louisiana Supreme Court reversed the district court, which held Article 782 was unconstitutional, reasoning:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
This Court recently followed the Louisiana Supreme Court’s jurisprudence in State v. Raymond, 08-1204, pp. 23-24 (La.App. 5 Cir. 4/28/09); 13 So.3d 577, 592, writ denied, 09-1205 (La.2/5/10); 27 So.3d 296, holding the trial court did not err in allowing the jury’s non-unanimous verdict *686 of 11 to one. As the State notes, the United States Supreme Court recently denied writs of certiorari in Bowen v. Oregon, - U.S. -, 130 S.Ct. 52, 175 L.Ed.2d 21 (2009), thereby declining to take up the issue of whether the Sixth Amendment right to a jury trial, as applied to the states through the Fourteenth Amendment, allows a criminal conviction based on a non-unanimous jury verdict. See also, Lee v. Louisiana, — U.S.-, 129 S.Ct. 130, 172 L.Ed.2d 37 (2008), in which the Supreme Court recently denied certiorari, thereby declining to consider a constitutional challenge to Article 782.
The trial court did not err in denying relator’s motion to quash, since a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts. See State v. Bertrand, supra. Similarly, as an intermediate appellate court, this Court is 113obliged to follow the precedent established by the Louisiana Supreme Court. Gauthreaux v. Rheem Mfg. Co., 588 So.2d 723, 725 (La.App. 5 Cir.1991), writ denied, 592 So.2d 409 (La.1992).
Based on the foregoing reasons, we find this assignment of error to be meritless.

ASSIGNMENT OF ERROR NUMBER TWO

The trial court erred by failing to include the defendant’s requests for jury instructions.

DISCUSSION

Defendant contends the trial court erred in denying his request for two special jury charges. The State counters that the trial court did not err in denying defendant’s proposed charges, since they were redundant, did not reflect the status of the law, and would have confused the jury.
LSA-C.Cr.P. art. 802 requires the trial court to charge the jury as to the law applicable to the case. Under LSA-C.Cr.P. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. The special charge need not be given if it is included in the general charge or in another special charge to be given. State v. Hollins, 08-1033, p. 3 (La.6/26/09); 15 So.3d 69, 71. Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. Id.; State v. Smith, 04-340, p. 11 (La.App. 5 Cir. 10/26/04); 888 So.2d 280, 289.
At the conclusion of the trial testimony, the trial court held a charging conference. Defendant submitted a list of four proposed special jury instructions. 114His argument pertains to only the first and third proposed charges. The first special jury instruction the defense requested was as follows:
If the evidence would support both the offense charged and the responsive offenses, the defendant has the right under La.C.Cr.P. art. 814 to have the jury consider convicting him only of a lesser crime even though the evidence clearly will support a conviction of the offense charged.
The State objected to the proposed charge because it would be repetitive of general charges the trial court would give. The judge stated, “I tend to agree. I think to add the instruction is confusing. So I’m not going to include the instruction.” The defense objected to the trial court’s ruling.
Defendant submitted the following as his third proposed charge:
A confession is a form of circumstantial evidence and is subject to the stan *687 dard of such evidence in that it must exclude any other explanation but guilt. See standard for conviction based on circumstantial evidence.
The trial court denied that charge, and defense counsel objected.
We do not find that the trial court erred in denying the first proposed charge. First, as the trial court noted, the wording of the proposed charge was convoluted, and was likely to confuse the jury. Secondly, the trial court’s general jury charges were sufficient to inform the jury of its option to return a responsive verdict. For instance, the trial court instructed the jury:
As to counts 1 and 2, if you are not convinced beyond a reasonable doubt that Joshua Thomas is guilty of armed robbery but you are convinced beyond a reasonable doubt that Joshua Thomas is guilty of a lessor [sic] included offense, you should reflect that conclusion on your verdict form.
A responsive verdict to the charge of armed robbery is guilty of attempted armed robbery.
The trial court did not err in denying defendant’s third proposed special jury charge. Defendant did not offer any jurisprudence to support his statement of the |1filaw, nor does he offer such support on appeal. Additionally, the subject matter of the proposed charge was sufficiently covered in the trial court’s general charge:
A defendant cannot be convicted on his own uncorroboration [sic] confession without independent proof that a crime has been committed. However, if the State provides through independent evidence that a crime has been committed by someone, a confession alone may be used to identify the defendant as the perpetrator of the crime. Furthermore, in cases involving physical injury to a person or property, the State must show only that the injury did, in fact, occur and that someone was criminally responsible for that injury. The State is not required to show any link between the defendant and the injury outside of the confession.
Unlike the proposed charge, the trial court’s statement of the law is supported by the jurisprudence. See State v. Harris, 01-2730, pp. 38-39 (La.1/19/05); 892 So.2d 1238, 1261, cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005); State v. Chism, 08-474, p. 14 (La.App. 5 Cir. 12/16/08); 3 So.3d 41, 49, writ denied, 09-0153 (La.10/2/09); 18 So.3d 102.
Based on the foregoing reasons, we find this assignment of error to be meritless.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We not the following matters for review.
Defendant’s sentence on count 4 is illegally lenient. LSA-R.S. 14:34 provides that “[wjhoever commits an aggravated battery shall be fined not more than five thousand dollars,” but the trial court failed to impose a fine. The State did not object at the time of sentencing, and does not address this issue in brief to this Court.
This Court has held that a statute providing for a fine of “not more than” a specified amount does require a mandatory fine, but the matter is not free from Indoubt. State v. Kerlec, 06-838, p. 8 (La.App. 5 Cir. 4/11/07); 957 So.2d 810, 815, writ denied, 07-1119 (La.12/7/07); 969 So.2d 626. The Louisiana Supreme Court has held that an appellate court has the authority to correct an illegally lenient sentence that fails to impose a mandatory fine. State v. Decrevel, 03-0259, *688 (La.5/16/03); 847 So.2d 1197 (per curiam). But that authority is discretionary, and in certain circumstances, this Court has refrained from amending the defendant’s sentence to impose a fine. State v. Hearn, 09-434, p. 9 (La.App. 5 Cir. 12/29/09); 30 So.3d 873, 879; State v. Turner, 08-1188, p. 7 (La.App. 5 Cir. 5/12/09); 13 So.3d 695. Since the State did not object to the trial court’s failure to impose a fine as to count 4, and defendant is indigent,[6] we refrain from exercising our authority to correct the illegal sentence.
While the commitment reflects that defendant was properly advised of the prescriptive period for filing post-conviction relief in accordance with LSA-C.Cr.P. art. 930.8, the transcript reflects that defendant received an incomplete advisal. At the time of sentencing, the judge informed defendant, “[y]ou have two years to seek post-conviction relief.” The transcript prevails when there is a discrepancy between the commitment and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983). This Court has held the failure to advise a defendant that the prescriptive period runs from the time his conviction and sentence become final is incomplete. State v. Grant, 04-341, p. 5 (La.App. 5 Cir. 10/26/04); 887 So.2d 596, 598. We correct the error by now informing defendant in this opinion that no application for post-conviction relief, including an application for an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of LSA-C.Cr.P. |17art. 914 or 922. State v. Hill, 09-89, p. 7 (La.App. 5 Cir. 5/26/09); 15 So.3d 1042, 1046.
DECREE
Based on the foregoing reasons, defendant’s convictions and sentences are affirmed.
AFFIRMED.

. The State subsequently amended the bill of information to dismiss counts 1 and 3 as to Shawn Martin only.

. Defendant also filed a pro se motion to quash, in which he argued that one of the alleged victims in his case was now deceased, so a trial on that count would violate his constitutional right of confrontation. The trial court summarily denied the pro se motion.

.On August 25, 2009, the trial court granted defendant's motion to sever co-defendant, Shawn Martin, for trial.

. Sergeant Carroll testified that Foot Locker did not approve a charge to Mr. Melerine’s account, but that a charge was approved at Kids Foot Locker.

. Since defendant challenges the constitutionality of a State statute, this Court sent notice by certified mail to the Louisiana Attorney General's Office in accordance with LSA-R.S. 13:4448.

. Defendant is represented on appeal by the Louisiana Appellate Project. See State v. McGee, 09-102, p. 12 (La.App. 5 Cir. 9/29/09), 24 So.3d 235, 242, in which this Court refrained from exercising its authority to correct an illegally lenient sentence imposed without a mandatory fine, reasoning that the defendant's sentence resulted from a guilty plea and the defendant appeared indigent because he was represented by the Louisiana Appellate Project.